United States District Court
Southern District of Texas
**ENTERED**
February 28, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GEORGE N. GINDO, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Case No. 4:19-CV-1745 |
| DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; AECOM TECHNOLOGY CORPORATION; AND CONTINENTAL INSURANCE COMPANY, | § § § § § § § § § § | |
| *Defendants.* | § § § | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff George N. Gindo ("Plaintiff") appeals the denial of worker's compensation benefits under the Longshore and Harbor Worker's Compensation Act ("LHWCA"), as extended in the Defense Base Act ("DBA"), for injuries resulting from his employment with Defendant AECOM Technology Corp. ("AECOM") in warzone Iraq. *See* Pl.'s Petit. Judicial Rev., ECF No. 1.[1] Plaintiff moves to vacate the denial of his claim and seeks remand, asserting *inter alia* that

---

[1] The matter was referred to this Court for a report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B). Order, ECF No. 18.

the Administrative Law Judge ("ALJ") erred when he rejected the Parties' stipulation that Plaintiff was temporarily totally disabled without providing notice. Pl.'s Br., ECF No. 15 at 22. The ALJ implicitly rejected the Parties' stipulation and determined that Plaintiff had a permanent partial disability and was not yet entitled to compensation. ALJ Order, ECF No. 1-2 at 12 & n. 18. On appeal the Benefits Review Board ("BRB") affirmed. BRB Order, ECF No. 1-2 at 28. On reconsideration, the BRB affirmed and stated that the stipulation could not have been accepted because it was an incorrect application of the law. BRB Reconsideration Order, ECF No. 1-2 at 32.[2]

The Court reviews an appeal from the BRB in a two-step inquiry: first, whether the BRB applied the correct legal standard on appeal, and second, whether the BRB properly found that substantial evidence supported the ALJ's findings. *Ortco Contractors, Inc. v. Charpentier*, 332 F.3d 283, 287 (5th Cir. 2003). Because the BRB applied the wrong legal standard when affirming the ALJ's rejection of the

---

[2] This Court has jurisdiction over this claim pursuant to the DBA provision of the LHWCA. Under the DBA, "judicial proceeding provided under sections 18 and 21 of the LHWCA in respect to a compensation order made pursuant to this Act shall be instituted in the United States District Court of the judicial district wherein is located the office of the deputy commissioner whose compensation order is involved." DBA § 3(b), 42 U.S.C. § 1653(b); *AFIA/CIGNA Worldwide v. Felkner*, 930 F.2d 1111, 1116 (5th Cir. 1991) (holding that judicial review of a BRB's DBA decision must begin in the judicial district wherein the office of the District Director who issued the initial order is located). Because Plaintiff's residence is in Illinois, the claim was referred to the Eighth Compensation District Office in Houston, Texas for administration. 20 C.F.R. §§ 702.102, 704.101. The Houston District Director served the ALJ's order on the parties. The BRB's final decision was issued in the Houston District. Therefore, this Court has jurisdiction over Plaintiff's claim. *See* 42 U.S.C. § 1653(b).

Parties' stipulation without providing notice, the Court recommends that the case be remanded.

## I.   LEGAL STANDARD FOR THE LHWCA AND THE DBA

The LHWCA "is a federal program to compensate maritime employees for on-the-job injuries leading to death or disability." *Gencarelle v. Gen. Dynamics Corp.*, 892 F.2d 173, 176 (2d Cir. 1989) (citing 33 U.S.C. § 903(a)). Injury is limited to accidents and occupational diseases arising out of employment. *Id.* (citing 33 U.S.C. § 902 (2)).[3] Once an ALJ determines that a claim is covered, the next step is to define the injured worker's compensation. Under the LHWCA, compensation is calculated using the average weekly wage at the time of injury. 33 U.S.C. §§ 908(c); 910(a)–(c). The LHWCA provides compensation for four categories of disabilities: (1) permanent total disability, (2) temporary total disability, (3) permanent partial disability, and (4) temporary partial disability. 33 U.S.C. § 908(a)–(c), (e). *Avondale Shipyards, Inc. v. Guidry*, 967 F.2d 1039, 1042 (5th Cir. 1992).

The DBA extends and incorporates the LHWCA to provide federal workers' compensation coverage to employees working outside the continental United States,

---

[3] A covered "injury" under the LHWCA is an:

> accidental injury or death arising out of and in the course of employment, and such occupational diseases or infection a arises naturally out of such employment or as naturally or unavoidably results from accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment.

33 U.S.C. § 902(2).

including on military bases. 42 U.S.C. § 1651(a). Thus, in a DBA case, once the ALJ determines that the claim is covered, he must determine the plaintiff's average weekly wage based on the category of disability under which the plaintiff falls. *See e.g., Avondale Shipyards*, 967 F.2d at 1042 (finding plaintiff suffered from a temporary total disability for part of his claim; a permanent total disability when he reached maximum medical improvement; and a permanent partial disability when he subsequently secured employment thereafter).

## II.    STANDARD OF REVIEW

The Court's review of an application for worker's compensation under the LHWCA and DBA presents a mixed question of law and fact. *New Orleans Depot Servs. v. Dir., Office of Worker's Comp. Programs*, 718 F.3d 384, 387 (5th Cir. 2013) (en banc). The Court considers whether the BRB on appeal applied the correct legal standard in determining whether substantial evidence[4] supports the ALJ's decision. The BRB must accept the findings of the ALJ "unless they are not supported by substantial evidence in the record considered as a whole or unless they are irrational." *Tarver v. Service Employees Intern., Inc.*, No. 4:11-1040, 2011 WL

---

[4] "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotations omitted). Substantial evidence is "more than a scintilla but less than a preponderance." *Pool Co. v. Cooper*, 274 F.3d 173, 178 (5th Cir. 2001). The "threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. The Court may not reweigh the evidence or substitute its judgment for the ALJ. *Tarver*, 2011 WL 6957591, at *4.

6957591, at *4 (S.D. Tex. Dec. 30, 2011) (quoting *Port Cooper/T. Smith Stevedoring Co., Inc. v. Hunter*, 227 F.3d 285, 287 (5th Cir. 2000)). The BRB does not have authority "to engage in *de novo* review of the evidence or to substitute it views for those of the ALJ." *Chevron USA, Inc. v. Heavin*, 204 F. App'x 361, 363 (5th Cir. 2006).

The Court's review of the BRB's decision is "limited in scope to considering errors of law and making certain that the BRB adhered to its statutory standard of review of factual determinations, that is, whether the ALJ's findings of fact are supported by substantial evidence and are consistent with law." *Ortco Contractors, Inc. v. Charpentier*, 332 F.3d 283, 287 (5th Cir. 2003) (internal quotations omitted). The Court reviews the BRB's legal conclusions *de novo. Coastal Prod. Servs. v. Hudson*, 555 F.3d 426, 429 (5th Cir. 2009); *Equitable Equip. Co. v. Dir., OWCP*, 191 F.3d 630, 632 (5th Cir. 1999) ("[The court] reviews the BRB's interpretation of the LHWCA, an issue of law, *de novo*, affording no special deference to the BRB's construction because it is not a policymaking agency."). The Court must affirm if the ALJ's findings are supported by substantial evidence and are in accordance with the law. *P & M Crane Co. v. Hayes*, 930 F.2d 424, 428 (5th Cir. 1991).

## III.   THE ALJ REJECTED PART OF THE PARTIES' STIPULATIONS IN DENYING PLAINTIFF'S CLAIM.

Before the ALJ, Plaintiff sought workers' compensation based on psychiatric injuries suffered during his employment with AECOM as an advisor to the United

States Army in Iraq. ALJ Order, ECF No. 1-2 at 3. Plaintiff experienced post-traumatic stress disorder ("PTSD") and major depressive disorder when he returned from the warzone. *Id.* at 4; J. Ex. 12 at 173. Plaintiff alleged that his work with AECOM triggered these symptoms. ECF No. 1-2 at 4. AECOM conceded that Plaintiff "suffered work-related psychiatric harm and that [he] has been temporarily totally disabled since July 23, 2014." *Id.* Before the ALJ, AECOM disputed benefits on two grounds: that Plaintiff failed to provide timely notice, and any compensation must be based on a lower amount than Plaintiff sought. *Id.* The Parties waived oral hearing, instead submitting stipulations of fact[5] as well as joint and separate exhibits.[6] *Id.*

The ALJ denied Plaintiff's claim as premature. ECF No. 1-2 at 16. Although the ALJ noted the Parties' stipulations, ECF No. 1-2 at 3-4, he implicitly rejected the stipulation that Plaintiff was temporarily totally disabled. Instead, the ALJ found Plaintiff was statutorily limited to permanent partial disability because he was a

---

[5] The Parties submitted Joint Stipulations of Fact. ALJ's Decision & Order, ECF No. 1-2 at 3, n. 3. The stipulated facts include:

> 5. Claimant suffered an injury or disease that arose out of his employment. He has not reached maximum medical improvement.
>
> 6. Under section 7 of the Longshore Act, AECOM National Security Programs, Inc. is liable for and has authorized medical benefits for Claimant's psychiatric condition.
>
> 7. Claimant became temporarily totally disabled on July 23, 2014. Claimant became aware of his disability the same day.

[6] The parties submitted 17 joint exhibits ("J. Ex." 1–17); Plaintiff submitted 14 exhibits independently ("P. Ex." 1–14); AECOM submitted 38 exhibits independently ("D. Ex." 1–38). ECF No. 1-2 at 3, n. 2.

voluntary retiree with an occupational disease. ECF No. 1-2 at 12 (finding occupational disease), 12 n.18 (finding permanent partial disability), 14 (finding retirement voluntary). Under permanent partial disability, a claimant cannot receive compensation until he reaches maximum medical improvement. *Id.* at 15. Because the Parties stipulated that Plaintiff had not yet reached maximum medical improvement, the ALJ concluded that Plaintiff could not yet recover for the permanent partial disability. *Id.*[7]

On appeal, and reconsideration, the BRB affirmed the ALJ's denial of compensation, determining that substantial evidence supported the ALJ's findings of fact. BRB Order, ECF No. 1-2 at 22, 24, 25; BRB Reconsideration Order, ECF No. 1-2 at 28.

## IV.   THE ALJ ERRED WHEN HE REJECTED THE PARTIES' STIPULATION WITHOUT PROVIDING NOTICE.

Plaintiff argues that the ALJ erred in reaching a conclusion that contradicted the Parties' binding stipulation that he was temporarily totally disabled without providing notice. ECF No. 15 at 33-34; Pl.'s Reply Br., ECF No. 19, at 6-9. In addition, Plaintiff asserts that the ALJ erred in considering whether he retired because the issue was only raised for the first time in Defendant's closing brief and

---

[7] Maximum medical improvement is reached when an injury has received "the maximum benefit of treatment such that the patient's condition will not improve." *Gulf Best Elec., Inc. v. Methe*, 396 F.3d 601, 604 (5th Cir. 2004) (citing *La. Ins. Guar. Ass'n v. Abbott*, 40 F.3d 122, 126 (5th Cir. 1994)).

Plaintiff had no opportunity to respond to it. *Id.* at 49-72. Defendant disagrees, asserting that there was no stipulation as to temporary total disability. ECF No. 17 at 41-45.[8] Further, Defendant argues that there was ample evidence for the ALJ to determine that Plaintiff was retired. *Id.* at 45.[9]

### A. The ALJ Is Not Bound to Accept the Parties' Stipulations.

"The parties may stipulate to any facts in writing at any stage of the proceeding or orally on the record at a deposition or at a hearing. These stipulations bind the parties ***unless the judge disapproves them***." 29 C.F.R. § 18.83 (a) (emphasis added). Generally, stipulations are binding upon the parties who enter them. *Wright v. Normandy Terrace Healthcare & Rehab. Center,* No. SA-12-CA-0622-XR, 2012 WL 2979040, at *1 (W.D. Tex. July 19, 2012). Pleadings are regarded as judicial admissions, a "formal concession in the pleadings or stipulations by a party or counsel, that is binding on the party making them." *Id.*; *accord Flynn v. Sanchez Oil*

---

[8] To the extent Defendant argues that Plaintiff failed to raise this issue to the BRB and waived this argument, the Court finds it without merit. On appeal, the BRB discussed Plaintiff's argument concerning the ALJ rejecting the parties' stipulation. BRB Order, ECF No. 1-2 at 19 (noting the stipulation); BRB's Reconsideration Order  at 3. ("Thus, to the extent the parties stipulated that claimant became temporarily totally disabled in July 2014, the stipulation could not have been accepted because it evinces an incorrect application of law."). Even if Plaintiff raised it for the first time on appeal to this Court, as it involves a pure question of law *and* the proper resolution is beyond doubt, even Defendant admits that the Fifth Circuit would allow it. Def.'s Sur-Reply Br., ECF No. 26 at 4 (citing *Texas v. United States*, 730 F.2d. 1138, 1140 (5th Cir. 1983)).

[9] Because the Court finds that the ALJ erred in rejecting the Parties' stipulation without notice, it declines to address the myriad other arguments the Plaintiff and Defendant have included in their briefing. These issues should be address based on a full factual record when the case is remanded. A full description of Plaintiff's work history and medical history is summarized in the Appendix A attached to this opinion.

*& Gas Corp.*, No. AS-19-CV-00867-JKP, 2020 WL 955304, at *2 (W.D. Tex. Feb. 27, 2020) (citing *Christian Legal Soc. Chapt. Of the Univ. of Cal., Hastings Coll. Of the Law v. Martinez,* 561 U.S. 661, 667-80 (2010)) ("factual stipulations have the effect of judicial admission, that is both binding on the parties and conclusive in the case.").[10]

Although stipulations are binding on the parties, an ALJ is not obligated to accept them. 29 C.F.R. § 18.83 (a); *see, e.g., Mitri v. Global Linguistic Solutions, et al.*, 48 BRBS 41 (2014) (reversing ALJ's decision when he accepted parties' stipulations that contained an incorrect application of law). If an ALJ rejects the stipulations, however, he must provide the parties with prior notice that he will not accept them, his rationale for rejecting them, and an opportunity to submit evidence in support of their positions. *See Martin v. BPU Management Inc.*, 46 BRBS 11, 16 (2012); *Dodd v. Newport News Shipbuilding & Dry Dock Co.*, 22 BRBS 245, 1989 WL 245294, at *4 (May 31, 1989) (per curiam); *Beltran v. Calif. Shipbuilding & Dry Dock, et al.*, 17 BRBS 225, 1985 WL 55376, at *3 (Sept. 25, 1985) (per curiam).

Thus, the Court will determine whether the Parties made the stipulation as to Plaintiff's disability status, and whether the ALJ accepted or rejected the stipulation.

---

[10] In contrast, a "court is not bound by the parties' stipulations of law, particularly when those stipulations are erroneous." *King v. United States*, 641 F.2d 253, 258 (5th Cir. 1981); *accord Provident Fin., Inc. v. Strategic Energy L.L.C.,* 404 F. App'x 835, 838, n.3 (5th Cir. 2010) ("[T]o the extent that the parties made the erroneous stipulations on a question of law, we are not bound the accept those stipulations.").

### B. The Parties Stipulated to Plaintiff's Temporary Total Disability.

Incredibly, Defendant argues that there was no stipulation that Plaintiff was temporarily totally disabled. *Id.* at 41. This argument is contrary to Defendant's submissions to the ALJ as well as the ALJ's opinion. In sum, it is patently frivolous.

#### 1. *Defendant's submissions to the ALJ admit to the stipulation.*

Under the rules of practice and procedure for administrative hearings, each party must submit a signed prehearing statement to the presiding judge. 29 C.F.R. § 18.80. The prehearing statement must include the "stipulated facts that require no proof." *Id.* § 18.80 (c)(4). In its prehearing statement, Defendant recognized that Plaintiff was temporarily disabled. Defendant selected "temporary total from July 23, 2014" in the prehearing statement form that inquires whether the disability was permanent total, temporary total, permanent partial, and temporary partial. *See* Def.'s Prehearing Statement, at 2, attached as Appendix B.[11] Later in that document, Defendant wrote: "The parties have stipulated as submitted. The parties have not yet reached any agreement on other facts." *Id.* at 3. Counsel signed Defendant's prehearing statement. *Id.* at 4.

Furthermore, although the Parties waived the hearing, the ALJ provided a briefing schedule and they both submitted post-hearing briefs. *See* 29 C.F.R. § 18.91 ("a judge may grant a party time to file a post-hearing brief with proposed findings

---

[11] The briefing before the ALJ is not part of the administrative record. *See* ECF No. 14. The administrative record was not electronically filed so is not part of the CM/ECF electronic file.

of fact, conclusions of law, and the specific relief sought."). Defendant's brief contains multiple references to the stipulation. For example, in the opening statement section, Defendant acknowledged the stipulation to Plaintiff's temporary total disability, as follows:

> AECOM has accepted liability for Claimant's medical treatment for his psychiatric disability. **The parties have stipulated that Claimant has been temporary and totally disabled since July 23, 2014**… Thus, the **only issues** in this case **concern whether Claimant is entitled to compensation for temporary total disability**, and if so, then what the proper rate should be.

Def.'s Post Hrg. Br., at 2 (emphasis added) (attached as Appendix C). In the stipulated facts section of the brief, Defendant repeated that Plaintiff "became temporarily totally disabled on July 23, 2014." *Id.* at 2-3. Following the list of stipulated facts, Defendant notes that "the parties have *also* entered stipulations" concerning other facts, implicitly recognizing that stipulations were made as indicated. *Id.* at 3 (emphasis added). Defendant repeated the temporarily totally disabled language in the section on retirement status. *Id.* at 17 ("The parties agree that Claimant became temporarily totally disabled on July 23, 2014.").

Defendant's argument that pleadings are not binding and should not be treated as a stipulation is without merit. No specific form is required to constitute a stipulation. A statement a party makes in its briefing can be construed as a judicial admission. *Wright*, 2012 WL 2979040, at *1; *accord GlobeRanger Corp. v. Software AG*, 27 F. Supp. 3d 723, 744 (N.D. Tex. 2014) (citing *City Nat. Bank v. United*

*States*, 907 F.2d 536, 544 (5th Cir.1990) ("[W]hether to treat prior 'statements in briefs as binding judicial admissions of fact ... is within [the Court's] discretion.'")). Accordingly, courts routinely treat facts contained in a party's pleadings as stipulations. *Wright*, 2012 WL 2979040, at *1; *accord F.D.I.C. v. Bledsoe*, 989 F.2d 805, 807 (upholding a district court's decision that the facts contained in one party's pleadings were stipulations). "A party making a stipulation or judicial admission is barred from disputing it." *Wright*, 2012 WL 2979040, at *1. Thus, Defendant's pleadings before the ALJ that Plaintiff was temporarily totally disabled constitute judicial admissions, are binding, and Defendant is barred from disputing it. *See id.*

### 2. *The ALJ's Order recognizes the temporarily totally disabled stipulation.*

Contrary to Defendant's contention, the ALJ recounted the Parties' stipulation that, "Claimant became temporarily and totally disabled on July 23, 2014. Claimant became aware of his disability the same day." ALJ's Order, ECF No. 1-2 at 5. The ALJ cited to the stipulations in the record, including joint stipulations, as well as Defendant's prehearing statement and closing brief. *Id.* at 4 n.3. In addition, the ALJ stated that Defendant conceded Plaintiff has been temporarily totally disabled. *Id.* at 4. On appeal, the BRB also noted the Parties stipulated that Plaintiff had been temporarily totally disabled. BRB Order, ECF No. 1-2 at 19. Thus, Defendant's contention that there was no stipulation that Plaintiff was temporarily totally disabled defies credulity.

**C. The ALJ Erred When Rejecting the Parties' Stipulation Without Notice.**

Because of the Parties' stipulations, according to the Defendant, the only issues before the ALJ were whether the Plaintiff was "entitled to compensation for temporary total disability, and if so, then what the proper rate should be." Def.'s Post Hrg. Br. at 2 (attached as Appendix C).[12] After recounting the stipulation that Plaintiff was temporarily totally disabled in his order, however, the ALJ implicitly rejected it. Although the opinion does not state that the ALJ rejected the stipulation, the ALJ found to the contrary that the case was one of permanent partial disability. ALJ Order, ECF No. 1-2 at 12.

Under the Administrative Procedure Act ("APA"), the parties are entitled to know the matters of fact and law asserted at the hearing. 5 U.S.C. § 554 (b)(3). Parties to the proceeding are required to give prompt notice of issues controverted in fact or law. *Id.* Moreover, the agency shall give all parties opportunity for the submission and consideration of facts. *Id.* § 554 (c)(1). Accordingly, while an ALJ is entitled to reject the parties' stipulation, 29 C.F.R. § 18.83 (a), he may not do so without affording them notice so that they can submit further facts for consideration. *Martin*, 46 BRBS at 16; *Dodd*, 1989 WL 245294, at *4; *Beltran*, 1985 WL 55376, at *3.

---

[12] According to Plaintiff, the only issues Defendant contested before the ALJ were timeliness and compensation rate based upon a calculation of average weekly wage. ECF No. 15 at 26.

Here the Parties exchanged prehearing statements and decided to waive their hearing, instead submitting the case on stipulated facts. Even the Defendant's post-hearing brief argues that the calculation of damages is based on Plaintiff's status as temporarily totally disabled. *See, e.g.,* Def.'s Post Hrg. Br. at 17 (attached as Appendix C). When the ALJ implicitly rejected the stipulation that Plaintiff was temporarily totally disabled and instead found that he was permanently partially disabled, it changed the statutory provisions applicable to the claim and the damages available under the award. ALJ Order, ECF No. 1-2 at 12-13 & n. 18. Thus, the ALJ was required under the APA and case law to give notice that he would not accept the stipulation that Plaintiff was temporarily totally disabled, with his rationale, and an opportunity to submit further evidence. 5 U.S.C. § 554 (b). He failed to state that he rejected the stipulation, provide any reasoning, or any opportunity to supplement the record. Thus, the ALJ's decision is not in accordance with the law. *See Erickson v. Crowley Maritime Corporation et al*, 14 BRBS 218, 220 (1981) (explaining that when the ALJ rejects a stipulation but fails to notify the parties, he has violated the APA).

## D. The BRB Applied the Wrong Legal Standard.

The BRB's legal conclusions are reviewed *de novo.* The Court must affirm if the ALJ's findings are supported by substantial evidence and are in accordance with the law. *P & M Crane Co.*, 930 F.2d at 428.

14

### 1. *The ALJ committed an error of law.*

The APA requires the ALJ to notify the parties as to the issues to be decided in their case, affording them an opportunity to prepare. 5 U.S.C. § 554(b). The ALJ did not provide notice that he intended to reject the stipulation, and "the parties justifiably relied upon their stipulation[] and had an insufficient opportunity to prepare for litigation on the issue of disability." *See Phelps*, 16 BRBS at 327. Because the ALJ failed to notify the Parties of his intention to reject the stipulation that Plaintiff was temporarily totally disabled, he violated the APA. Defendant argues that the issue of Plaintiff's disability was intertwined with the issue of calculating his average weekly wage, and therefore not a new issue that required notice. ECF No. 17 at 50. The BRB rejected the same argument that "the nature and extent of disability was inextricably involved with the other issues in [the] case." *Klubnikin v. Crescent Wharf & Warehouse Co.*, 16 BRBS 182, 185 (1984). "Where the [ALJ] fails to notify the party but decides the issue in his decision and order, the decision must be vacated and the case remanded." *See id. a*t 184 (vacating decision when ALJ failed to notify parties of a new issue that warranted consideration that arose during the hearing).

### 2. **The BRB erred in affirming the ALJ.**

On appeal, the BRB rejected Plaintiff's argument, stating that "[t]he parties' briefs address all aspects of the issues before the administrative law judge, including

whether claimant's injury is an occupational disease and how his average weekly wage should be calculated." BRB's Reconsideration Order at 3. However, because the ALJ failed to provide notice that he intended to reject the stipulation on temporary total disability, the Parties' briefs were premised on the assumption that the stipulation would be accepted. *Phelps*, 16 BRBS at 327. Additionally, the ALJ found Plaintiff could not receive compensation because the Parties stipulated that Plaintiff had not achieved maximum medical improvement. ALJ's Order, ECF No. 1-2 at 15. But this stipulation was also premised on the assumption that the previous stipulation would also be accepted.

Because the ALJ's failure to give notice and an opportunity to submit further evidence was an error of law, the BRB erred when it affirmed the ALJ's decision on appeal and on reconsideration. *Equitable Equip. Co.*, 191 F.3d at 632. Therefore, the decision must be vacated, and the case remanded. *Klubnikin,* 16 BRBS at 184; *see Martin*, 46 BRBS at 16 (affirming when ALJ provided notice and explained rationale for rejection of stipulation since he followed the correct procedure).

### 3.  *The ALJ's error harmed Plaintiff and requires remand.*

Courts do not remand unless "it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999). The BRB's decision denied Plaintiff the opportunity to properly brief his case before the ALJ, a procedural right under the

LHWCA. This denial harmed Plaintiff. *Ingalls Shipbuilding Inc. v. Director,* 102 F.3d 1385, 1389 (5th Cir. 1996) (finding that denial of an applicant's "procedural rights under the LHWCA" is not harmless error). Additionally, neither the BRB nor the Court can substitute its opinion for that of the ALJ or consider the facts *de novo*. *Chevron USA,* 204 F. App'x at 363; *Eysselinck v. Director*, No. H-07-4589, 2009 WL 677137, at *37 (S.D. Tex. Mar. 11, 2009).  Therefore, the Court recommends that Plaintiff's case be remanded to the ALJ to reconsider Plaintiff's case and conduct new factual findings. On remand, the ALJ should be instructed to provide notice of any stipulations he intends to reject and new issues that may be raised, affording the Parties an opportunity to fully brief their case.

## V.   CONCLUSION

This Court recommends that Plaintiff's appeal should be **GRANTED**. ECF Nos. 1, 15. Plaintiff's case should be **REMANDED** to the ALJ for a redetermination consistent with this opinion.

**The Parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude review of factual findings or legal conclusions, except for plain error. *Quinn v. Guerrero*, 863 F.3d 353, 358 (5th Cir. 2017).**

Signed at Houston, Texas, on February 28, 2022.

_____
**Dena Hanovice Palermo**
**United States Magistrate Judge**

## APPENDIX A

### A. Plaintiff's Employment History.

Beginning in 2008 Plaintiff worked as an Iraqi Advisor for a government contractor[13] in warzone Iraq. J. Ex. 8 at 29. Plaintiff claims that his employment in Iraq triggered his PTSD and major depressive disorder. ECF No. 1. While in Iraq, he worked near high tension zones and was regularly exposed to dangerous and stressful conditions both on and off the base. J. Ex. 8 at 29-33, 54-55. He gathered intelligence for the U.S. military, talking with Iraqi locals to collect information on "the daily situation, daily life of [non-military] people [including] economic, religious, social, [and] political." J. Ex. At 29. According to Plaintiff, performing his duties exposed him to multiple rocket attacks,[14] injured soldiers, and dead body bags being carried away. J. Ex. 8 at 32-33, 38-39.[15] Plaintiff recalled he was a passenger in a helicopter that came under fire in two or three occasions. J. Ex. 8 at 37.

---

[13] Plaintiff's first employer in Iraq was SOS International. J. Ex. 8 at 29. Plaintiff's employer changed multiple times when McNeil Technologies acquired the government contract from SOS International; subsequently, AECOM Technology Corp acquired McNeil Technologies, changing its name from AECOM National Security Programs, Inc. J. Ex. 8 at 29. Plaintiff maintained his role and job duties during this change of employers. J. Ex. 8 at 29.

[14] Plaintiff's exhibits included articles documenting frequent bombing attacks in warzone Iraq during the relevant time. P. Ex. 11 at 250-82.

[15] In addition to Plaintiff's testimony, Plaintiff provided an affidavit from William Goodgine, Plaintiff's former Supervisor in Iraq, who testified that Plaintiff's work "was nonstop, dangerous, highly stressful and exhausting." P. Ex. 10 at 239-40. Specifically, as a part of his duties, Plaintiff had to "travel unescorted outside of the gates of the military base [which were] subject to suicide bombers, car bombs, and small arms fire." In addition, when traveling from base to base, their

Plaintiff's employment ceased when the U.S. government canceled his employer's contract. J. Ex. 4 at 8; D. Ex. 2 at 5. On September 11, 2011, Plaintiff left Iraq, and has not been gainfully employed since then. J. Ex. 8 at 28, 35. Upon his return to the United States, he applied for and received unemployment benefits from the State of Illinois between October 13, 2022 and February 16, 2013. J. Ex. 15 at 239-242; J. Ex. 17 at 295; D. Ex. 2 at 5. While he was receiving unemployment benefits, Plaintiff continued to apply for jobs and contacted recruiters. D. Ex. 22 at 154 (showing ten job applications that Plaintiff submitted to Illinois' unemployment office). After his unemployment benefits ended, he continued to apply for work, but Plaintiff testified that he could not recall for how long. J. Ex. 8 at 49.

## B. Plaintiff's Medical History.

The Parties do not dispute that Plaintiff suffered from PTSD and major depressive disorder. The onset of his injury was delayed until 2014. J. Ex. 12 at 173. As a result of the delayed onset of Plaintiff's psychological conditions, the ALJ classified his work-related injuries as occupational diseases, ALJ's D&O at 13, which affects the time of injury and calculation of benefits. To the contrary, Plaintiff claims that his injuries are traumatic injuries. ECF No. 15 at 57.

---

"vehicle convoys were under threat from improvised explosive devices (IEDs), mines, and militant attacks." *Id.*

In support of his position, Plaintiff asserts that the medical records show that he began suffering from these conditions while in Iraq. *Id*. at 23-25, 51-53. Shortly after he returned to the U.S., in March 2012, Plaintiff complained of chronic intermittent anxiety to his treating physician, Dr. Massel. J. Ex. 11 at 144. According to Plaintiff, around this time his wife noticed increasing problems with his temperament, observing greater depression and lower energy levels. J. Ex. 8 at 35. Because Plaintiff claimed his anxiety was improving, however, Dr. Massel did not refer Plaintiff or treat the anxiety at the time. J. Ex. 11 at 144.

In March 2014, Dr. Massel described Plaintiff as experiencing gradually worsening symptoms of depression "since at least September 2013" including "decreased concentration, depressed mood, excessive worry, insomnia, irritability, malaise, nervous/anxious behavior and restlessness." J. Ex. 11 at 154. At this time, Plaintiff complained that his symptoms were interfering with daily activities and causing him significant distress. J. Ex. 11 at 154. Dr. Massel referred Plaintiff for mental health counseling first with psychiatrist Dr. Gutzmann, and later Dr. Rahim after Plaintiff began to complain of severe depression. J. Ex. 8 at 40; J. Ex. 12 at 173.

On July 23, 2014, Dr. Rahim diagnosed Plaintiff with major depressive disorder and PTSD, concluding that Plaintiff's psychological conditions left him unable to work. J. Ex. 12 at 173. Dr. Rahim opined that Plaintiff's work in Iraq

caused both the major depressive disorder and PTSD, which had a delayed onset. J. Ex. 12 at 173. Dr. Rahim treated Plaintiff with cognitive behavioral therapy and medication. J. Ex. 12 at 173; J. Ex. 9 at 85-87.

Another psychiatrist, Dr. Conroe, evaluated Plaintiff in March 2016. J. Ex. 13 at 207. Dr. Conroe also diagnosed Plaintiff with major depressive disorder and possible associated PTSD. J. Ex. 13 at 207. He opined that being in Iraq contributed significantly to the development of Plaintiff's psychiatric conditions. J. Ex. 13 at 208; J. Ex. 10 at 114. Dr. Conroe also concurred with Dr. Rahim that Plaintiff's PTSD had a delayed onset, with symptoms developing months or years after the trauma. J. Ex. 10 at 109. Dr. Conroe opined that Plaintiff would have difficulty sustaining work activity on a "day by day, week by week basis." J. Ex. 13 at 208. According to Dr. Conroe, Plaintiff had not reached maximum medical improvement and would need six to twelve more months of cognitive behavioral therapy and medication. J. Ex. 10 at 112.

Rev 6/15

BEFORE THE UNITED STATES DEPARTMENT OF LABOR OFFICE OF **RECEIVED**
ADMINISTRATIVE LAW JUDGES

AUG 0 2 2016

Office . . . . . . Law Judges
. . . . francisco, Ca

Case Caption and No.       **AECOM NATIONAL SECURITY PROGRAMS INC.,**
**MCNEIL TECHNOLOGIES, INC. and CONTINENTAL**
**INSURANCE COMPANY, et al.   2015-LDS-00046**

**PRETRIAL STATEMENT of:**   ❑ Claimant _____
❑ Director, OWCP; X Respondents   **AECOM NATIONAL SECURITY PROGRAMS INC.,**
**F.K.A. MCNEIL TECHNOLOGIES, INC. and**
**CONTINENTAL INSURANCE COMPANY**

In accordance with 29 C.F.R. § 18.80, each party must complete and deliver to the other parties and the presiding judge a signed prehearing statement no later than the date specified in the Notice of Hearing and Prehearing Order. For cases arising under the Longshore and Harbor Workers' Compensation Act and its extensions, including the Defense Base Act, a party using this form will be deemed to have satisfied the requirements of Section 18.80.

1.   Briefly summarize, below or on attached sheet, the facts or circumstances you contend gave rise to this claim, and describe the nature of the claimed injury or disease.

   **George Gindo alleges he suffers from a cumulative psychiatric occupational disease disability as the result of cumulative exposure to war hazards employment in Iraq ending on or about September 13, 2011. AECOM National Security Programs, Inc. f.k.a. McNeil Technologies, Inc. and Continental Insurance Company contend that Claimant untimely noticed and filed his claims and that he is barred from compensation benefits on the grounds that he was aware of his disability and the connection to his employment on September 13, 2011, but waited almost three years to notice of file his claim.**

2.   State your contentions as to the place of injury: **the alleged place of injury is Iraq**; its date **a. 07/23/14**; the date disability commenced **07/23/14**; the date Claimant became aware disability was work related **09/13/11**; and the date employer had notice of injury **08/19/14**.

   3.   This claim is for:   **X** compensation; ❑ medical benefits; ❑ penalties (under § _____ ); ❑ other _____.

4.   Do you contend or concede that:

   (a)   The LHWCA applies to this claim.   **X** Yes ❑ No

   (b)   At the time of the alleged injury, an employer-employee relationship existed between Claimant and Employer.   ❑ Yes **X** No

(c)    Claimant has suffered an injury or disease.  **X** Yes ❑No

(d)    The alleged injury or disease arose out of and in the course of Claimant's employment.    **X** Yes ❑No

(e)    The claim was ❑ timely noticed; **X** untimely noticed; ❑ timely filed; X untimely filed.

(f)    Claimant is/was entitled to:   compensation    ❑ Yes **X** No
                         medical benefits   **X** Yes ❑No

(g)    Employer/Carrier is currently providing:   compensation    ❑ Yes **X** No
                                              medical benefits   **X** Yes ❑No

(h)    Claimant has reached maximum medical improvement.  **X** No  ❑ Yes, on **N/A**.

(i)    Claimant has outstanding medical bills. **X** No  ❑ Yes, to:

    _____      $ _____

    _____      $ _____

    _____      $ _____

5.    Are nature and extent of disability disputed?    ❑ Yes **X** No

6.    Is Claimant now working? **X** No    ❑ Yes: ❑ in his/her usual employment started on_____; ❑ in alternative employment started on_____.

7.    You contend or concede that claimant is now able to do:
    ❑ his/her regular pre-injury work without loss of earnings; ❑ alternative work; **X** no work.

8.  You contend or concede that the alleged injury or disease is: **X** unscheduled; OR
    ❑ a scheduled injury which caused a _____ % loss/loss of use of _____.

9.    You contend or concede that the alleged injury or disease caused disability which was/is:
    ❑ permanent total from _____ to _____
    **X** temporary total from July 23, 2014 to present
    ❑ permanent partial from _____ to _____
    ❑ temporary partial from _____ to _____

10.    You contend or concede that Claimant's average weekly wage when injured was **$0.00** under § 10 subsection **c**, and that his/her retained weekly earning capacity is: ❑ zero; OR ❑ **unknown, TTD** based on: ❑ his/her current earnings; ❑ labor market survey(s); **X** other facts.

2

11.   Is Special Fund relief sought?  **X** No ☐ Yes.
      If Yes, is the Director:        ☐ conceding entitlement;
                                       ☐ asserting absolute bar;
                                       ☐ denying entitlement on grounds of:
                                          ☐ no pre-existing disability;
                                          ☐ disability not manifest to employer;
                                          ☐ contribution requirement not met?

12.   Set forth below or on separate page(s) other contentions, issues or ultimate facts which you
      will present at trial (e.g., last responsible employer; § 33(g); collateral estoppel; credits;
      etc.), and succinctly brief any novel legal questions.

      **AECOM National Security Programs, Inc. f.k.a. McNeil Technologies, Inc. will
      contend: (1) the claim was untimely noticed; (2) untimely filed; and, (3) Claimant
      submitted and inaccurate LS-200.**

13.   State below or on separate page(s) the stipulated facts that require no proof (a sample
      stipulation form can be found at www.oalj.dol.gov/FORMS.HTM).

      **The parties have stipulated as submitted.  The parties have not yet reached any
      agreement on other facts.**

14.   To the extent not previously provided on this Prehearing Statement form, state below or on
      separate page(s) the facts disputed by the parties.

      **Average Weekly Wage – Claimant contends his average weekly wage is $2,558.65
      under Section 10(a).  Employer and Carrier contend his average weekly wage is $0.00
      under Section 10(c).**

15.   Set forth below or on separate page(s) a list of witnesses you expect to call.

      **None, by hearing by submission.  Employer and Carrier will introduce the live-
      perpetuation testimony of Henry Conroe and Syed Rahim.**

16.   Set forth below or on separate page(s) a list of the joint exhibits.

17.   Set forth below or on separate page(s) a list of the party's exhibits.

      **See Exhibit Index per Pre Hearing Order**

18.   Estimated time required for you to present your case-in-chief:  **N/A**

19. State below or on separate page(s) any additional information that may aid the parties' preparation for the hearing or the disposition of the proceeding, such as the need for specialized equipment at the hearing.

**AECOM National Security Programs, Inc. f.k.a. McNeil Technologies, Inc. and Continental Insurance Company will submit video evidence requiring the use of DVD player and or internet browser.**

DATE:   August 1, 2016   /s/: _____

Edwin B. Barnes, Thomas, Quinn & Krieger, LLP
Representative for **AECOM NATIONAL SECURITY PROGRAMS INC., F.K.A. MCNEIL TECHNOLOGIES, INC. and CONTINENTAL INSURANCE COMPANY**

Address:               781 Beach Street, Suite 330
                       San Francisco, CA 94109
Telephone number:      (415) 546-6100
Fax number:            (619) 376-1824
Email address:         ebarnes@tqklaw.com

-4-



RECEIVED

SEP 19 2016

Office of Administrative Law Judges
San Francisco, Ca

1   THOMAS QUINN, L.L.P.
    Michael W. Thomas (State Bar No. 168348)
2   Edwin B. Barnes (State Bar No. 295454)
    781 Beach Street, Suite 330
3   San Francisco, CA 94109
    Tel: (415) 546-6100
4   Fax: (619) 376-1824

5
    Attorneys for Respondents
6   AECOM NATIONAL SECURITY PROGRAMS INC., F.K.A.
    MCNEIL TECHNOLOGIES, INC. and CONTINENTAL
7   INSURANCE COMPANY

8
9               UNITED STATES DEPARTMENT OF LABOR

10               OFFICE OF ADMINISTRATIVE LAW JUDGES

11

12  GEORGE GINDO,

13          Claimant,                        OALJ Case No.:   2015-LDA-00046

14      v.                                   OWCP Case No.:   08-302442

15  AECOM NATIONAL SECURITY
    PROGRAMS INC., F.K.A. MCNEIL
16  TECHNOLOGIES, INC.,                      **AECOM NATIONAL SECURITY
                                             PROGRAMS, INC. AND
17          Employer,                        CONTINENTAL INSURANCE
                                             COMPANY'S POST HEARING
18  CONTINENTAL INSURANCE COMPANY,           BRIEF (ON SUBMISSION)**

19          Carrier.

20

21

22          Employer, AECOM National Security Programs, Inc. and Carrier, Continental Insurance

23  Company (collectively, "AECOM") submit this Brief  for Formal Hearing by Submission with

24  respect to George Gindo's ("Claimant") claim for compensation for psychiatric disability under

25  the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* ("LHWCA")

26  as extended by the Defense Base Act, 42 U.S.C § 1651 *et. seq.* ("DBA").

27

28      AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
        COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)
                                - 1 -

**OPENING STATEMENT**

1

2        The undisputed facts of this case will show that Claimant left his employment as an Iraqi

3   Advisor with AECOM in September 2011 as the result of AECOM's contract with the United

4   States being cancelled as part of the demobilization and exit of Armed Forces from Iraq in

5   December 2011.  AECOM has accepted liability for Claimant's medical treatment for his

6   psychiatric disability.  The parties have stipulated that Claimant has been temporary and totally

7   disabled since July 23, 2014 when his treating psychiatrist diagnosed him with PTSD.  Claimant

8   seeks temporary total disability compensation from July 23, 2014 to the present and continuing.

9        Thus, the only issues in this case concern whether Claimant is entitled to compensation

10  for temporary total disability, and if so, then what the proper rate should be.  The threshold

11  question is whether Claimant suffers from an occupational disease.  If Claimant suffers from an

12  occupational disease then either he recovers based on his earnings as of July 23, 2014 ($0.00),

13  or he recovers based on the national average weekly wage Congress has granted to workers who

14  become disabled due to work-related occupational disease after their employment ends.  33.

15  U.S.C. §§ 901(i); 910(c); 910(d)(2); 908(c)(23).  On the other hand, if Claimant does not suffer

16  from an occupational disease, then he suffers from an accidental/traumatic injury by default, and

17  he is not entitled to any compensation benefits because he has not established any loss of wage-

18  earning capacity, "because of his work injuries," pursuant to the Board's decision in *Moody v.*

19  *Huntington Ingalls, Incorporated*, BRB No. 15-0314 (Mar. 10, 2016).

20                              **STIPULATED FACTS**

21       (1)    Claimant's claim for compensation comes within the jurisdiction of the DBA.

22       (2)    Claimant was employed by AECOM, f.k.a McNeil Technologies, Inc.

23              ("McNeil") under Contract W52P1J-10-D-0022 ("A3S2") from on or about

24              August 8, 2010 to September 13, 2011 as an Iraqi Advisor.

25       (3)    AECOM is liable for and has authorized Section 7 medical benefits for his

26              psychiatric condition.

27

28   AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
     COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)
                              - 2 -

THOMAS QUINN, L.L.P.

61 Beach Street, Suite 330
an Francisco, CA 94109
el: (415) 546-0100
ax: (819) 370-1924

1      (4)    Claimant became temporarily totally disabled on July 23, 2014.

2      (5)   Claimant's date of awareness of his disability is July 23, 2014.

3      The parties have also entered stipulations, which the Court has previously confirmed,

4 concerning the identify of Claimant's employer, coverage, and the identification of AECOM as

5 the last responsible employer in this matter.  See Orders dated September 22, 2015; April 4,

6 2016; and April 19, 2016; Stipulations and Exhibits dated March 21, 2016.

7                    **STATEMENT OF FACTS**

8      Claimant was born on April 14, 1957 and is 59 years old.  He worked for Dyna Circuits

9 in the Chicago, IL for 18 years, first as a manufacturing engineering manager and later as the

10 director of sales and marketing until it went out of business right after September 11, 2001.

11 JXV1 Exh. 8 at 0052; 0059.[1]  From the time he left his employment at Dyna Circuits he was

12 unemployed, but had passive income from his partnership in B.T.T., LLC a commercial property

13 company in Arizona until it Chapter 11'd on October 15, 2012.  JXV1 Exh. 8 at 0049-0050;

14 0059.

15      In 2008 Claimant went to work for SOS International ("SOSI") as an Iraqi Advisor on

16 the A3S2 contract.  JXV1 Exh. 8 at 0029; 0054-0055.  Ownership of the A3S2 contract changed

17 hands from SOSI to McNeil and finally to AECOM when it purchased McNeil, (which was

18 known as AECOM National Security Programs, Inc. following the purchase).  Claimant was

19 retained in the same capacity with the same duties throughout all three employers under the

20 A3S2 contract until he was demobilized when the United States government cancelled A3S2

21 contract as part of the withdrawal of armed forces from the Iraq Theater on or about

22 September 13, 2011.  JXV1 Exh. 8 at 0029; 0054-0055.

23      When he returned home he received unemployment while he allegedly was

24 unsuccessfully seeking employment as a translator overseas until February 2013.  JXV1 Exh. 8

HOMAS QUINN, L.L.P.
61 Beach Street, Suite 330
en Francisco, CA 94109
el: (415) 646-5100
ax: (619) 376-1924

25

26 [1] Exhibits are referenced by a two-letter identification code, an alpha numeric volume code, the exhibit number, and page in the exhibits – i.e. Joint Exhibits JXV#, Employer and Carrier,

27 "ECV#" and Claimant's Exhibits, "CX."

28    **AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

1   at 0048; JXV3 Exh. 15 at 0239; 0242; JExh. 16 at 0270; Exh. 17 at 0295; ECV1 V1 Exh.1 at

2   0002; ECV2 Exh. 22 at 0154.  He performed at a New Years' Eve Gala on December 31, 2011

3   and help advertise the event. ECV2 Exh. 18; Exh. 19 at 0140; Exh. 20 at 0142.  For some

4   unknown duration in 2012 (but at least February through May) Claimant hosted a radio show

5   known as the Assyrian Artists Radio Program on 1590 WCGO AM radio in Evanston, IL every

6   Thursday night from 8:00-9:00 p.m. ECV2 Exh. 17 at 0129-0133; ECV2 Exh. 20 at 0143-0144.

7   He performed live music at restaurant nightclubs as late as fall of 2013, and perhaps as late as

8   July 5, 2015.  ECV2 Exh. 16 at 0121-0123; ECV2 Exh. 15 at 0119.  He helped out at "his son's"

9   restaurant Noora Café. See disc. *Infra* at 22-27.  He helped organize and participated in charity

10   events such as two golf tournaments in Chicago, IL and the 6th Annual Mesopotamian Nights

11   concert at the California Theater in San Jose, CA.  ECV1 Exh. 5 at 0038-0039, 0042, 0046; Exh.

12   5 at 0052; Exh. 6 at 0059-0060; ECV1 Exh. 8, see digital DVD I, DVD II Interviews.[2]  He wrote,

13   sang, and produced songs and a music video for his song Morree D Morree and participated in

14   the album SADHA.  ECV2 Exh. 13; ECV1 Exh. 7 at 0073-0074.  He started a music promotion

15   business called Amnareh Entertainment, LLC in 2013.  ECV1 Exh. 4 at 0013-0015; ECV1 Exh.

16   9 at 0077-0079.  He did not receive any wages and had no earnings as a result of these activities

17   other than his unemployment benefits. JXV1, Exh. 8.

18        On March 10, 2014 Claimant's primary care provider, Dr. Massel, reported that Claimant

19   had been suffering from symptoms of depression for six to twelve months and that they had been

20   gradually increasing.  JXV2 Exh. 11 at 0154.  On July 1, 2014 Dr. Massel reported the most

21   recent episode lasted 24 hours and, "the severity of symptoms is incapacitating," and referred

22   him to a psychiatrist, Dr. Rahim. JXV2 Exh. 11 at 0168.

23

24   [2] In the Interviews section of DVD II, Mr. Gindo gives an interview where he is all smiles and
was not exhibiting any symptoms of PTSD.[2]  He noted that he had always been involved with

25   the Assyrian Aid Society, but never at events that large. *Id.* at 00:45.  When asked if he was
nervous and how he prepared, he laughed and replied that he had lots of practice to cross his t's

26   and dot his i's. *Id.* at 02:35.  Finally, when asked about the internet, Facebook, and social media,
Mr. Gindo smiled and said they were great ways, "to get your voice out," and, "to commercialize

27   yourself." *Id.* at 05:20.

28   **AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE**
     **COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**
                - 4 -

HOMAS QUINN, L.L.P.

01 Beach Street, Suite 330
an Francisco, CA 94100
el: (415) 540-8100
ex: (919) 378-1824

1    On his initial intake on July 23, 2014, Dr. Rahim diagnosed Claimant with post-traumatic

2  stress disorder ("PTSD") and major depressive disorder ("MDD").  JXV2 Exh. 12 at 0175.  Dr.

3  Rahim assigned Claimant GAF Scores, 50, 55, and 60 during the course of his treatment.  JXV2

4  Exh. 12 at 0181; 0185; 0187; 0189; 0191; 0193; 0195; 0197; 0199; 0203.  At his deposition Dr.

5  Rahim testified that Claimant could not work when he first saw him on July 23, 2014.  JXV1

6  Exh. 9 at 0087.

7    Claimant sought compensation for temporary total disability on July 20, 2014.  CX Exh.

8  1 at 1.  He seeks temporary total disability compensation from July 23, 2014 and on-going.

9  **INTRODUCTION**

10    The LHWCA provides compensation for disability for injuries that cause an employee

11  to lose the ability to perform his or her usual work. 33 U.S.C. § 901 *et seq.*

12  Section 2(2) of the LHWCA defines "injury":

13    **§ 902 – When used in this chapter –**

14    (2) The term "injury" means accidental injury or death arising out of and in the
15    course of employment, and such occupational disease or infection as arises
      naturally out of such employment or as naturally or unavoidably results from
16    such accidental injury, and includes injury caused by the willful act of third
      person directed against an employee because of his employment.
17

18  Section 2(10) of the LHWCA defines "disability":

19    **§ 902 When used in this chapter –**

20    (10) "Disability" means incapacity because of injury to earn the wages which the
21    employee was receiving at the time of injury in the same or any other
      employment; but such term shall mean permanent impairment promulgated and
22    modified from time to time by the American Medical Association, in the case of
      an individual whose claim is described in section 901(d)(2) of this title.
23

24  33 U.S.C. § 902(10).[3]

25  ──────────────────
    [3] Disability encompasses both physical and economic considerations.  *Moody*, BRB No. 15-
26  0314; citing *Newport News Shipbuilding & Dry Dock Co. v. Director, OWCP*, 592 F.2d 762, 10
    BRBS 81 (4th Cir. 1979)[*Chappel*]; see also *New Orleans (Gulfwide) Stevedores v. Turner*, 661
27  F.2d 1031, 1039 (5th Cir. 1981).

28

HOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94100
el: (415) 546-0100
ax: (519) 376-1824

1       After the 1984 Amendments three systems emerged for compensation for injuries and

2 disabilities: (1) claimants who suffered from post-employment onset occupational disease, 33

3 U.S.C. §§ 910(d),(i); 908(c)(23); (2) claimants who suffer scheduled injuries, 33 U.S.C. §

4 908(c)(1)-(22); and, (3) claimants who suffer unscheduled accidental injuries. *Bath Iron Works*

5 *v. Director, OWCP*, 506 U.S. 153 (1993).

6       Claimant left his employment due to AECOM losing the A3S2 contract and

7 demobilizing all of its employees.  He has not earned any wages since he left AECOM on

8 September 13, 2011.  He only became disabled on July 23, 2014.  Thus, the central question in

9 this case is what Claimant has lost as a result of his latent onset post-employment disability.  The

10 answer turns on whether he has an occupational disease.

11

12
### I.    IF CLAIMANT SUFFERS FROM AN OCCUPATIONAL DISEASE THEN HIS COMPENSATION IS BASED ON HIS DATE OF AWARENESS, JULY 23, 2014.

13       Prior to the 1984 Amendments, claimants who suffered from non-scheduled injuries,

14 whether occupational disease or accidental, were unable to recover compensation benefits if they

15 left their employment for reasons other than their employment.  See *Addell v. Owens-Corning*

16 *Fiberglass*, 16 BRBS 131 (1984).  In 1984 Congress amended the LWHCA to provide

17 compensation for occupational disease which manifested and caused disability after the

18 employee had left work by explicitly overruling *Addell*, and adjusting the time of injury in such

19 cases to be the date of awareness. 33 U.S.C. 910(i); *Manders v. Alabama Dry Dock and*

20 *Shipbuidling Corp.*, 23 BRBS 19, 1989 WL 245261 at 2 (1989) citing HR REP.NO.1027, 9th

21 Cong., 2d Sess. 30.  The 1984 Amendments created three new provisions that applied to this

22 newly covered category of employees and which are pertinent to this case:

23     **§ 910 – Determination of Pay**

24     (i)     For purposes of this section with respect to a claim for compensation for death or disability due to an occupational disease which does not immediately result in death

25 or disability, the time of injury shall be deemed to be the date on which the employee or claimant becomes, or in the exercise of reasonable diligence or by reason of medical

26 advice should have been aware, of the relationship between the employment, the disease, and the death or disability.

27

28
AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)

THOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94109
el. (415) 545-6100
ax: (619) 378-1824

(d)(2) Notwithstanding paragraph (1), with to any claim based on a death or disability due to an occupational disease for which the time of injury (as determined under subsection (i) of this section) occurs –

...

(B)     more than one year after the employee has retired the average weekly wage shall be deemed to be the national average weekly wage...applicable at the time of injury.

## § 908 – Compensation for disability

(c)     In case of disability partial in character but permanent in quality the compensation shall be 66 2/3 per centum of the average weekly wages, which shall be in addition to compensation for temporary total disability or temporary partial disability paid in accordance with subsection (b) or section (e) of this section, respectively, and shall be paid to the employee, as follows:

(23)     Notwithstanding paragraphs (1) thorough (22), with respect to a claim for permanent partial disability for which the average weekly wages are determined under section 901(d)(2) of this title, the compensation shall be 66 2/3 per centum of such average weekly wages multiplied by the percentage of permanent impairment, as determined under the guides referred to in section 902(10) of this title, payable during the continuance of such impairment.

33. U.S.C. §§ 901(i); 910(d)(2); 908(c)(23).   With these sections Congress resolved the fundamental unfairness that occurred by giving employees who were previously only entitled to medical benefits access to compensation benefits.   At the same time, Congress limited employers' liability to compensation based on the NAWW for employees who suffered from disease which manifested more than one year after they left their employment, and limited recovery to temporary total disability and awards for permanent impairment under the AMA Guides.

a.     **Claimant suffers from a latent onset occupational disease.**

Courts use a three-part test to determine whether an employee suffers from an occupational disease. *Gencarelle v. General Dynamic Corp.*, 892 F.2d 173, 176 (2d Cir. 1989). ALJs have uniformly determined that claimants who suffer from PTSD as a result of employment in Iraq satisfy the three-part *Gencarelle* test:

**AECOM NATIONAL SECURITY PROGRAMS, INC. AND CONTINENTAL INSURANCE COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

- 7 -

(1)     the employee must suffer from a disease, meaning any serious derangement of health or disordered state of an organism or organ;

(2)     hazardous conditions of employment must be the cause of the disease; and,

(3)     the hazardous conditions must be peculiar to *the* employment as opposed to other employment generally by a relevant comparison between the hazardous conditions or background risks of employment generally.

*Id.*; see *Robert Donahue v. Dyncorp Technical Services*, 2008-LDA-00174 slip op at 4-8 (Nov. 12, 2008); *Charles Kovacs v. MPRI, Inc./L-3 Communications*, 2010-LDA-00047 slip op. at 12-15 (Jun. 10, 2010); *William Cross v. IAP Worldwide Services, Inc.*, 2010-LDA-00319 & 00320 slip op at 10 (Dec. 6, 2011); *William Zielinski v. Triple Canopy*, 2012-LDA-00270 slip op at 21-27 (Jun. 27, 2013); *Susan Paul v. Global Linguist Solutions*, 2011-LDA-00294 & 00295-00297 slip op at 35 (Feb. 11, 2013).

## 1.   Claimant suffers from a disease.

Under the first element of *Gencarelle*, a claimant must suffer from a disease, which has been expansively interpreted to include a serious derangement of health or disordered state of an organism or organ. *Gencarelle*, 892 F.2d at 176. The Seventh Circuit has explained that the onset of the disease and its symptoms must be gradual. *Bunge Corp. v. Carlisle*, 227 F.3d 934, 938-939 (7th Cir. 2000). And, the United States Supreme Court has explained that conditions that result from prolonged exposures that intuitively are not considered injuries as a result of the exposure is a characteristic of occupational disease. *Bath Iron Works v. Director, OWCP*, 506 U.S. 153, 164-165 (1993). Mr. Gindo's PTSD and co-morbid MDD are such diseases because he was exposed to the horrors of war over an extended period of time from 2008 to 2011, which gradually expressed themselves three years later when Claimant became disabled on July 23, 2014.

Dr. Massel, Claimant's primary care provider of ten years described a gradual onset of symptoms beginning six to twelve months prior to March 8, 2014, which gradually increased in severity until he was "incapacitated," on July 1, 2014. JXV2 Exh. 11 at 0154. Dr. Conroe and

HOMAS QUINN, L.L.P.
01 Beach Street, Suite 330
an Francisco, CA 94109
el. (415) 546-6100
ax: (816) 376-1824

1   Dr. Rahim specifically diagnosed Claimant with "delayed onset" PTSD as he did not begin to

2   develop symptoms for three years after his employment and concluded that he is currently

3   temporarily totally disabled. JXV2 Exh. 12 at 0175; JXV1 Exh. 9 at 0087; JXV1 Exh. 9 at 0090-

4   0091; JXV1 Exh. 13 at 0207-0208; JXV2 Exh. 10 at 0105.  Claimant's interviews with Dr.

5   Obolsky highlight the disordered state of his current condition as Claimant was unable to focus

6   or concentrate, displayed signs of anhedonia (frequent pauses, trance states, etc.), and in some

7   instances, forgot the questions that were just asked of him. ECV4 Exh. 35, Exh. 36.

8       These symptoms, which were both reported by Claimant's doctors and confirmed in his

9   interviews with Dr. Obolsky, demonstrate a mental health derangement and disordered thought

10  process. Claimant not only has difficulty concentrating on what he is doing, but also experiences

11  anhedonic episodes and panic attacks lasting up to 24 hours in duration. JXV2 Exh. 11 at 0168.

12  Furthermore, these symptoms have impaired his social functioning, causing Claimant to

13  withdraw from activities he used to enjoy - for example, he testified he was not able to attend

14  his wife's birthday, he is unable to perform music, and he cannot finish a round of golf. JXV1

15  Exh. 8; ECV4 Exh. 35, Ex. 36.

16      Claimant lived in an environment where he feared for his life on a daily basis and

17  witnessed death and destruction. Just as the Supreme Court explained that whereas exposure to

18  loud noise immediately results in deafness, "the average person would not consider himself

19  injured merely because asbestos fibers were embedded in his lungs," *Bath Iron Works*, 506 U.S.

20  at 165, so too can be said of Claimant's PTSD but even more forcefully – the average person

21  would not consider himself injured merely because he almost fell out of chopper; the average

22  person would not consider himself injured merely because he saw a body bag; and, the average

23  person would not consider himself injured merely because a mortar nearly missed him.  These

24  are all examples of when the average person would consider himself lucky he *had not been*

25  *injured*.  Nonetheless, just like asbestos fibers, Claimant's exposures to hazardous conditions

26  and psychiatric symptoms built up and expressed themselves progressively over time.

27

28

HOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94100
el (415) 545-6100
ax (610) 378-1824

AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)

2.   **The hazardous conditions of Claimant's employment in Iraq caused his disease and satisfy *Gencarelle*'s second requirement.**

In addressing whether hazardous conditions of employment caused the occupational Courts have required that hazardous conditions be environmentally external. *Gencarelle Bunge, Donahue*; Kovacs, etc. There is no dispute that the external environmental hazardous conditions of Claimant's employment caused his disease, and the dispute is easily resolved by reference to the Section 20(a) presumption. See e.g. *Zielinski*. In order to make a *prima facie* case for compensation and be entitled to the Section 20(a) presumption that the claim comes within the provisions of the LHWCA, 33 U.S.C. § 920(a), Claimant must show: (1) he sustained physical harm; and, (2) an accident occurred or working conditions existed at claimant's job which could have caused the harm. see e.g. *Keliata v. Triple A Machine Shop*, 13 BRBS 326 (1981).[4]

At his interview with Dr. Obolsky, when questioned on what the most stressful experience was, Claimant explained there were a few incidents when he remembered the most when he was running from shelling, but that there were many incidents like that. ECV4 Exh. 35 at 0334.   When asked what other events he remembered, Claimant replied, "it's accumulative," and referenced incidents where there was shelling. ECV4 Exh. 35 at 0334. Although he recalled one time when he jumped to the floor when a mortar hit, he also said he could not recall because, "there were so many of them." ECV4 Exh. 35 at 0335.  He also explained that flying in the choppers there were many close calls from maneuvering where he was, "holding onto your life." ECV4 Exh. 35 at 0335. Claimant also explained that there were lots of incomings at FOB Normandy and FOB Warhorse where he worked that traumatized him. ECV3 Exh. 34 at 0280. He further explained that he experienced "quite a few things," including,

---

[4] There is evidence that (1) Mr. Gindo has MDD and PTSD; (2) Mr. Gindo experienced stressful events while he was employed by AECOM; and, (3) the MDD and PTSD were caused by the stress events he experienced at AECOM.  Notably, if the Court finds that the hazardous conditions of Mr. Gindo's employment *did not cause* his disease, then Mr. Gindo has failed to make a *prima facie* case and he is not entitled to any benefits whatsoever.  See e.g. *U.S. Industries/Federal Sheet Metal, Inc. v. Director, OWCP*, 455 U.S. 608, 14 BRBS 631 (1982) ["*Riley*"].

THOMAS QUINN, L.L.P.

81 Beach Street, Suite 310
an Francisco, CA 94109
el (415) 546-8100
ax (619) 376-1924

1    "injury to people, body bags and running trying to save your life from the incoming rockets."

2    ECV3 Exh. 34 at 0272.

3    Dr. Conroe testified that Claimant was exposed to on-going danger, but there were

4    particular incidents of shellings that were the main stressors. JXV2 Exh. 10 at 0105; JXV3 Exh.

5    13 at 0208. He also testified that Claimant's working conditions caused a psychiatric injury that

6    was cumulative in nature. JXV2 Exh. 10 at 0107; JXV3 Exh. 13 at 0208. Dr. Conroe explained

7    that cumulative meant that over a period of time he was exposed to actual events and has to do

8    with a build-up. JXV2 Exh. 10 at 0112-0113; JXV3 Exh. 13 at 0208. Dr. Conroe testified that

9    the on-going cumulative exposure to these events latently manifested as MDD with probable

10    PTSD.

11    Dr. Rahim testified that he agreed with Dr. Conroe's opinion that Claimant's

12    employment at AECOM exposed him to stresses that contributed to his ultimate MDD and

13    PTSD condition. JXV1 Exh. 9 at 0088. Dr. Rahim's initial evaluation notes Claimant witnessed

14    traumatic experiences while serving in Iraq and that he had near death experiences when

15    Claimant got caught up in shelling and bombing, from which he suffers frequent nightmares and

16    flash backs of the past trauma. JXV2 Exh. 12 at 0173-0174. Dr. Rahim also reports that

17    Claimant had a lot of nightmares and flashbacks specifically associated with the fireworks on

18    the Fourth of July, which caused him to recall the incoming shelling. JXV2 Exh. 12 at 0201.

19    Thus, similar to the claimants in *Donahue, Cross, Paul, Kovacs,* and *Zielinski,* there were

20    a few instances that stood out during Claimant's three years in Iraq, but for Claimant it was more

21    about the generally hazardous conditions of working in a warzone. He repeatedly turned back

22    to how many incoming mortar and rocket attacks there were. He also reported that his

23    employment required him to fly back and forth between two FOBs and that the choppers

24    frequently came under attack, which are the source of some of his nightmares. JXV1 Exh. 8;

25    ECV4 Exh. 34, 35. Working in an environment like Iraq where Claimant was constantly

26    exposed to external threats of violence are hazardous conditions caused his occupational disease

27    and accordingly the second requirement is easily satisfied.

THOMAS QUINN, L.L.P.

51 Beach Street, Suite 330
an Francisco, CA 94109
el: (415) 546-6100
ax: (818) 376-1624

28    **AECOM NATIONAL SECURITY PROGRAMS, INC. AND CONTINENTAL INSURANCE**
**COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

3. **The hazardous conditions of working in Iraq are peculiar to employment in an active warzone and satisfy *Gencarelle*'s third requirement.**

*Gencarelle*'s third requirement that the hazardous conditions be peculiar to the employment as opposed to employment generally is, as noted by ALJ Price, easily satisfied in a DBA case for disability to a psychiatric condition caused by three years of exposure to war in Iraq. See *Donahue*. The third requirement's comparison is achieved by comparing the conditions at the claimant's workplace and the corresponding risks of employment generally. *Gencarelle* at 177 citing *Golberg v. 954 Marcy Corp.*, 276 N.T. 313, 319 (1938). Workers are generally not exposed to mortar and rocket attacks from an angry and dangerous local populace. Nor do workers generally have to fly in choppers between FOBs over a warzone where the angry and dangerous local populace fires at them causing maneuvering that threatens to throw workers from the helicopter and fall to their death. see JXV1 Exh. 8; ECV3 Exh. 34, Exh. 35.

The third requirement is unequivocally established in this case and all three elements of an occupational disease having been established, Claimant suffers from an occupational disease. The next issue is determining his date of injury in order to determine his average weekly wage and compensation rate.

b. **Because Claimant suffers from an occupational disease which manifested after he left his employment at AECOM, his 'time of injury' is statutorily defined as his date of awareness.**

With the 1984 Amendments, Congress determined that claims for compensation due to an occupational disease which does not immediately result in death or disability, the, "time of injury" shall be deemed to be the date on which the claimant becomes aware, of the relationship between the employment, the disease, and the disability. 33 U.S.C. 910(i); *LaFaille v. Benefits Review Board*, 884 F.2d 54, 58-59 (2d Cir. 1989). The parties have stipulated Claimant's date of awareness is July 23, 2014 and Claimant seeks temporary total disability from that date forward. There is no evidence whatsoever that Claimant's occupational disease immediately caused disability and accordingly the 'time of injury' in this case is July 23, 2014. See e.g. *Coughlin*, 20 BRBS 193 (1988).

'HOMAS QUINN, L.L.P.

01 Beach Street, Suite 330
an Francisco, CA 94109
el (415) 546-0100
ac (019) 378-1924

**AECOM NATIONAL SECURITY PROGRAMS, INC. AND CONTINENTAL INSURANCE COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

1    If Claimant is an involuntary retiree, his average weekly wage on the time of injury,

2  July 23, 2014, is used to compute compensation. 33 U.S.C. § 910 *preamble*. On the other hand,

3  if Claimant is a voluntary retiree, then the national average weekly wage on July 23, 2014 is

4  taken as the basis to compute his wage because the time of injury was more than one year after

5  he "retired." 33 U.S.C. 910(d)(2).

6      **c.**    **Claimant is a voluntary retiree and his compensation is computed based on**

7            **the national average weekly wage at the time of injury, July 23, 2014.**

8    Courts have unanimously held that whether an employee is, "retired" under the 1984

9  Amendments is answered by asking whether the occupational disease had a role in the claimant's

10  decision to leave his employment with the employer. See *Rajotte v. General Dynamics Corp.*,

11  18 BRBS 85, 1986 WL 66362 at 1 (1986) (holding in an asbestos case claimant retired as a

12  result of his work-related illness and therefore had not voluntarily retired); *Johnson v. Ingalls*

13  *Shipbuilding Division, Litton Systems, Inc.*, 22 BRBS 160, 1989 WL 245306 at 2 (1989) (holding

14  that claimant voluntarily retired where claimant had no symptoms of asbestosis prior to leaving

15  employment); *Ponder v. Peter Kiewit Sons Co.*, 24 BRBS 46, 1990 WL 284099 at 2 (1990)

16  (holding claimant voluntarily retired where claimant's doctors made no notes of asbestosis prior

17  to retirement); *Manders*, 1989 WL at 2 (pre-*Bath Iron Works* occupational hearing loss case,

18  holding that claimants were voluntary retired where parties agreed claimants left employment

19  not because of for hearing loss but asbestosis); *Frawley v. Savannah Shipyard Corp.*, 22 BRBS

20  328, 1989 WL 245340 at 2 (1989) (holding claimant was a voluntary retiree where he was laid

21  off and where claimant testified that had work been available he would have continued to work);

22  *Coughlin v. Bethlehem Steel Corp.*, 20 BRBS 193, 1988 WL 232810 at 2-3 (1988) (holding

23  claimant who testified he would have continued to work if work had been available voluntary

24  retired but for the fact that he was laid off even though asbestosis had manifested prior to being

25  laid off); *Truitt v. Newport News Shipbuilding and Dry Dock Co.*, 20 BRBS 79, 1987 WL

26  107376 at 2-3 (1987) (remanding to ALJ to determine whether claimant left employment for

27  reasons due to work-related injury).

28

THOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
San Francisco, CA 94109
ac (415) 546-6100
ec (810) 376-1824

AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)

1    The rule is oriented around whether the claimant's motivation for leaving was his disease.

2    Thus, Courts have recognized that employees leave their employment due to other considerations

3    unrelated to the disease, such as: (1) economic considerations of the employer – e.g. being laid

4    off due to a downturn in the general industry or the closing of a shipyard, see *Coughlin*; *Frawley*;

5    (2) other disabling injuries, see *Manders*; (3) economic considerations of the claimant – e.g.

6    accepting early retirement, see *Ponder*; *Johnson*.

7    Finally, Courts have found employees to be retired even when they have worked in other

8    employment after leaving the employment with the employer. See e.g. *Frawley*. "Retirement,"

9    under the LHWCA, is not understood as 65 and Social Security, but rather, is understood more

10   precisely as separation from employment with the employer.  Thus, if the employee makes the

11   decision to leave his employment with the employer because of his occupational disease then his

12   retirement from the employer is involuntary.  But, if the employee's occupational disease played

13   no part in his decision to leave employment with the employer, his retirement from the employer

14   is voluntary.

15       1.    **Claimant did not leave his employment with AECOM because of his**

16   **occupational disease and thus his retirement is voluntary.**

17   There is no dispute that Claimant was separated from employment with AECOM because

18   the United States Army cancelled, and did not extend, the A3S2 contract.  Claimant testified that

19   the last time he was employed, "was at the end of contract, 2011." JXV1 Exh. 8 at 0028.  When

20   asked why he left his employment at AECOM, he testified, "It was end of the contract." JXV1

21   Exh. 8 at 0031.  Later, at his interview with Dr. Obolsky, Claimant said he left because he thought

22   the troops were pulling out and it was the end of the war and that there was no reassigning of the

23   employees to other contracts. ECV3 Exh. 34 at 0287.  Moreover, in discovery, Claimant has

24   maintained the position that any stress he was under while in Iraq was not disabling and did not

25   impede his ability to work for AECOM. See e.g. ECV2 Exh. 28 at 0176.

26   He was released from employment via a letter dated September 13, 2011, which

27   explained, "this action is due to the A3S2 Program, Task Order 5 for Iraq to which you have

28       **AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE**
    **COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**
    - 14 -

THOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94109
el (415) 546-6100
ax (810) 376-1924

1   been assigned being terminated." JXV1 Exh. 4 at 0008.  Claimant signed the letter and dated

2   his signature September 13, 2011.  *Id.*  Amanda Flanigan, a senior HR manager at AECOM,

3   reviewed the termination and declared under penalty of perjury that Claimant worked under the

4   A3S2 contract; Claimant's employment ended as a result of the termination of Task Order 5; all

5   other employees who were hired to work under the A3S2 contract were likewise terminated;

6   and, the United States Army did not extend or renew to the A3S2 contract to AECOM or any

7   other contractor. ECV1 Exh.2 at 0005; see also approved stipulations dated March 21, 2016. In

8   addition, AECOM Employment Change of Status documents dated September 13, 2011

9   indicated that Claimant's separation was involuntary and that his position was "de-scoped."

10  JXV1 Exh. 7 at 0023.  This release was in accordance with his employment contract, which

11  provided that his employment was, "for the duration of the task order period." JXV1 Exh. 5 at

12  0011. The contract also noted that his employment was "at-will" meaning that he was not being

13  employed for any duration and that his employment could be terminated at any time with or

14  without cause.  JXV1 Exh. 5 at 0014.

15      The evidence unequivocally demonstrates that Claimant's reason for separation from his

16  employer had nothing to do with his disease.  AECOM terminated all of its employees working

17  under the A3S2 contract when the United States cancelled the contract.

18      **2.      Claimant testified he would have continued working if he had not been laid**

19  **off and therefore he is a voluntary retiree.**

20      It is well recognized that claimants who were laid off and who also testified they would

21  have continued working but for the lay-off are voluntary retirees. *Frawley v. Savannah Shipyard*

22  *Corp.*, 22 BRBS 328, 1989 WL 245340 at 2 (1989).  This rule is even applied when claimant

23  actually has manifested symptoms of the disease prior to leaving the employment, but would

24  have kept working but for the lay-off. *Coughlin v. Bethlehem Steel Corp.*, 20 BRBS 193, 1988

25  WL 232810 at 2-3 (1988).

26      In *Frawley* claimant worked for the employer as a welder from 1945 until the shipyard

27  closed on August 31, 1984 and for a non-covered employer for about ten days before seeking

28  **AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE**
    **COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**
    **- 15 -**

HOMAS QUINN, L.L.P.
81 Beach Street, Suite 330
an Francisco, CA 94109
ok (415) 546-6100
ax (619) 376-1024

compensation for asbestos in 1985. *Frawley*, 1989 WL 245340 at 1. The administrative law judge found that claimant was a voluntary retiree and the Board affirmed *even though the claimant testified he experiences symptoms of asbestosis prior to when the shipyard closed.* Id. at 2. The Board reasoned that because, "claimant indicated that he would have continued working at both jobs if work had been available…[the] claimant left the workforce for reasons unrelated to his asbestosis." *Id.* at 2.

In *Coughlin* claimant worked as a welder where he was exposed to asbestos and fumes for thirty years until he was laid off on March 24, 1982 and the parties stipulated that he first became aware of his lung condition on November 29, 1982. *Coughlin*, 1988 WL 232810 at 1. The claimant appealed the ALJ's determination that he had voluntarily retired because there was evidence he was actually disabled prior to the last day of his employment and Board affirmed noting claimant did not contend he left his employment due to his disability and, "in fact, claimant testified he would have continued to work but for the fact that he was laid off by employer." *Id.* at 2.

Just as in *Frawley* and *Coughlin*, when asked if he would have taken a job as a translator after he was laid off from AECOM he said, "**if I found one, I would have probably start working,**" but that he could not **because of the job market.** JXV1 Exh. 8 at 0048. Claimant also testified that he was in contact with recruiters during this time period. JXV1 Exh. 8 at 0065. **At his deposition, when asked if Claimant would have continued working had AECOM not lost the contract, he replied, "I didn't have plans to stop working, no."** JXV1 Exh. 8 at 0053.

3.      As a voluntary retiree, Claimant's average weekly wage is $673.34.

As a voluntary retiree, Claimant's average weekly wage can be calculated one of two ways: (1) if July 20, 2014 is within one year of his retirement, then his average weekly wage is based on the wages he earned in the fifty-two weeks prior to retirement; or (2) if July 20, 2014 is more than one year after his retirement, then his average weekly wage is based on the NAWW on July 20, 2014. For the purposes of the LHWCA, Claimant retired from his employment on

'HOMAS QUINN, L.L.P.
81 Beach Street, Suite 300
an Francisco, CA 94109
el (415) 546-6100
ax (619) 376-1824

September 13, 2011 when he was discharged from AECOM for reasons than his occupational disease. See *supra*. On July 20, 2014 the NAWW was $673.34 and accordingly, Claimant's average weekly wage is statutorily defined as $673.34.

**4.** **As a retiree, Claimant is entitled to temporary total disability from July 23, 2014 to the present until he reaches MMI when his award will convert to a permanent impairment under the AMA guides.**

The parties agree that Claimant became temporarily totally disabled on July 23, 2014. Dr. Massel, Dr. Rahim, and Dr. Conroe all agree that claimant is TTD and has not reached MMI. Accordingly, Claimant is entitled to an award of $488.89 per week from July 23, 2014 ongoing until he has reached maximum medical improvement and he is assigned a permanent impairment under the AMA Guides. 33 U.S.C. § 8(c)(23).

**d.** **If Claimant is an involuntary retiree then Section 10(c) applies and his compensation is computed based of his wages at the time of injury, July 23, 2014.**

If claimant is not a voluntary retiree, then by default he is treated as an involuntary retiree who are compensated as employees who suffer from immediate disability based on the average annual earnings. 33. U.S.C. 910(d)(1). Section 10 of the LHWCA establishes three alternative methods for determining a claimant's average annual earnings. 33 U.S.C. § 910(a)-(c), which is then divided by 52 to arrive at the average weekly wage. 33 U.S.C. 910(d)(1). Where neither Section 10(a) nor Section 10(b) can reasonably and fairly applied, Section 10(c) is used. 33 U.S.C. § 910(c); *Lousian Insurance Guaranty Assoc. v. Bunol*, 211 F.3d 294, 297 (5th Cir. 2000). Neither Section 10(a) nor Section 10(b) can be applied in this case because Claimant did not work in the previous year before his time of injury, July 23, 2014, and Section 10(c) applies:

**§ 910. Determination of Pay**

(c) If either of the foregoing methods of arriving at the average annual earnings of the employee cannot be reasonably and fairly applied, such average annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality or other

HOMAS QUINN, L.L.P.
01 Beach Street, Suite 330
an Francisco, CA 94109
el: (415) 546-8100
ax: (619) 376-1024

1  employment of such employee, including the reasonable value of the services of
2  the employee if engaged in self-employment, shall reasonably represent the
   annual earning capacity of the injured employee.

3  33 U.S.C. § 910(c). The prime objective of Section 10(c) is to, "arrive at a sum that reasonably
4  represents a claimant's annual earning capacity *at the time of injury.*" *Empire Stevedores v.*
5  *Gatlin*, 936 F.2d 819, 822 (5th Cir. 1991)[*Gatlin*](emph. added). Earning capacity is the amount
6  of earnings that claimant would have had *the potential and opportunity* to earn absent the injury.
7  *Jackson v. Potomac Temporaries, Inc.*, 12 BRBS 410, 413 (1980)(emph. added). The Fifth
8  Circuit has observed that wages at the time of injury best reflect a claimant's earning capacity.
9  *Hall v. Consolidated Employment Systems, Inc.*, 139 F.2d 1025, 1031 (5th Cir. 1998).

10  Basically, three factors are considered: "(1) past earnings of the employee in which he
11  was working at the time of injury; (2) the earning history of employees of the same or most
12  similar class working in the same or most similar employment; and (3) the employment history
13  of the injured employee." *Service Employees Int'l, In. v. Director, OWCP, Civil Action H-11-*
14  *01065*, slip op. at 6-7 (S.D.TX Mar. 11, 2013)[SEII]; citing *Bay, Ltd. v. Dir., Office of Worker's*
15  *Comp. Programs*, 300 F. App'x 282, 285 (5th Cir. 2008). In *SEII* the Court vacated the Board's
16  holding that the claimants AWW under Section 10(c) should be solely based on their overseas
17  earnings and instructed the ALJs on remand to use a blend of pre-DBA wages and DBA wages
18  where claimants had only worked overseas for a short period of time, and where their contracts
19  were of limited duration. *SEII*, slip op. at 7-8; see e.g. *Ricky Martin v. Service Employees*
20  *International, Inc.*, 2010-LDA-00208 (Jan. 19, 2011).

21  However, Claimant's case cannot be fairly or reasonably applied under a pre-DBA and
22  DBA blend for a few reasons. First, Claimant has introduced no evidence of his pre-DBA wages,
23  and in fact had not worked since 2001, so there are no wages to blend. JXV1 Exh. 8. Second,
24  unlike *SEII* and *Ricky Martin* where the claimants suffered from traumatic injuries that caused
25  them to leave their employment and thus the time of injury was affixed as their last date of
26  employment, Claimant's time of injury is years after he left his employment. Third, Claimant's
27  wages on July 23, 2014 were $0.00. Fourth, no comparison can be made between two

THOMAS QUINN, L.L.P.
51 Beach Street, Suite 330
San Francisco, CA 94109
tel (415) 546-6100
fax (619) 376-1824

28  **AECOM NATIONAL SECURITY PROGRAMS, INC. AND CONTINENTAL INSURANCE**
    **COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

1    unemployed persons' wages.  Fifth, and most importantly, as Claimant's DBA work no longer

2    existed, those wages cannot possibly be considered as part of his earning capacity at the time of

3    injury. *Gatlin*, 936 F.2d at 822.

4      Claimant was released from employment via a letter dated September 13, 2011, which

5    explained, "this action is due to the A3S2 Program, Task Order 5 for Iraq to which you have

6    been assigned being terminated." JXV1 Exh. 4 at 0008. Amanda Flanigan, a senior HR manager

7    at AECOM reviewed the termination and declared under penalty of perjury that Claimant's

8    employment ended as a result of the termination of Task Order 5; all other employees who were

9    hired to work under the A3S2 contract were likewise terminated; and, the United States Army

10   did not extend or renew to the A3S2 contract to AECOM or any other contractor. ECV1 Exh.2

11   at 0005.  AECOM Employment Change of Status indicated that his position was "de-scoped."

12   JXV1 Exh. 7 at 0023. Claimant even testified the reason he left his employment at AECOM was

13   that, "It was end of the contract." JXV1 Exh. 8 at 0031.  Later, at his interview with Dr. Obolsky,

14   Claimant told him he left because he thought the troops were pulling out and it was the end of

15   the war and program and that there was no reassigning of employees. ECV3 Exh. 34 at 0287.

16     Claimant has put forth no evidence suggesting that overseas employment opportunities

17   were available to him after the A3S2 contract was cancelled and it is his burden to establish the

18   amount of his compensation as an element of his case.  Even if there were evidence in the form

19   of a retroactive Labor Market Survey showing the existence of jobs that Claimant could have

20   performed overseas, his unemployment records conclusively demonstrate that he could not get

21   such jobs.   On his LS-200 Claimant indicated he received unemployment benefits from

22   October 13, 2011 to February 16, 2013, which is corroborated by his tax records.[5] ECV1 Exh.1

23   at 0002. Claimant provided an unemployment document from the State of Illinois Department

24   of Employment Security that reported he had applied to jobs at CACI, Abraxis Corp. US Army

HOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94100
el: (415) 546-6100
ax: (516) 316-1824

25   [5] Claimant's 2013 tax return reports $3,125 received from the Illinois Department of

26   Employment Security. JXV3 Exh. 15 at 0239; 0242.  His 2012 tax return reports $28,513
     received from the Illinois Department of Employment Security. JXV3 Exh. 16 at 0270. His

27   2011 tax return reports $4,779 received form the Illinois Department of Employment Security.
     JXV3 Exh. 17 at 0295

28       AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
         COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)

1   Training, **McNeil Tech**, Sosi Int., Bluribus Int. Torres Co., SOC Inc., Valbin Corp.,. ECV2 Exh.

2   22 at 0154.  These jobs were in a capacity as a linguist or advisor, but Claimant still was unable

3   to secure employment.  ECV2 Exh. 22 at 0154.  Claimant also testified that he was in contact

4   with recruiters during this time period and he was still unable to secure employment.  JXV1 Exh.

5   8.  He didn't even get one interview or one call back during his year and a half of alleged

6   searching.  But, the best evidence that higher paying overseas jobs did not reflect his earning

7   capacity on July 23, 2014 is Claimant's own testimony that had he found a job he would have

8   taken it, but that he could not **because of the job market**. JXV1 Exh. 8 at 0048.

9          Thus, although it is unreasonable to use Claimant's overseas earnings, and although he

10   wasn't working for seven years prior to his DBA employment,[6] the question still remains what

11   Claimant lost on July 23, 2014 when he became disabled – i.e. what was his *potential and*

12   *opportunity*. *Jackson*, 12 BRBS 410.  The evidence demonstrates, and the parties do not dispute,

13   Claimant had no earnings after September 13, 2011.  After he left AECOM Claimant was done

14   making money.  Although he participated in various charity activities with his music, he testified

15   that he has never earned money from singing.  Thus, the Court should find that his average

16   weekly was $0.00 on July 23, 2014 and that he had not lost any potential to earn when he became

17   disabled on July 13, 2014.

18          However, if it too unreasonable to say he had no *potential* whatsoever on July 23, 2014,

19   see *Jackson*, 12 BRBS 410 (focus on potential and opportunity), then the Court could consider

20   the evidence Claimant was helping at his son's restaurant, Noora Cafe.  Even though he was not

21   paid, earned no wages, and earned no tips per his testimony and Taymen Gindo's, arguably he

22   could have had the restaurant been profitable or had he been a paid employee.

23   / / /

24   / / /

THOMAS QUINN, L.L.P.

81 Beech Street, Suite 330
an Francisco, CA 04109
el. (415) 546-6100
ax: (619) 376-1024

25   [6] Not only would it be unreasonable to use Claimant's wages from his employment at Dyna

26   Circuit, when just like his employment with AECOM, his employment ended because Dyna
     Circuit went out of business in 2001, but it would also be impossible because Claimant has not

27   introduced any evidence of what those earnings were.

28        AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
             COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)

Taymen Gindo ("Taymen") is Claimant's son.   In addition to working at Verizon Wireless, Samsung, and attending college between 2013 and 2015, he also opened Noora Café, a traditional Assyrian restaurant, in October of 2013.   ECV1 Exh. at 0081; ECV4 Exh. 36 at 0344.   Taymen testified he was not married.   ECV4 Exh. 36 at 0347.   Taymen testified that he was the only employee and was there every day of the week, but that he would ask his parents for help.   ECV4 at 0346.   Noora Café was open for seven days a week when it opened but changed to six.   ECV4 Exh. 36 at 0355.   He testified it was open from 11:00 a.m. to 11:00 p.m. and he was at the restaurant every day for the entire time it was open.   ECV$ Exh. 36 at 0355.

He said his mom was a, "helper,"[7] but that when she became overwhelmed Claimant would come by – a helper's helper if you will.   He testified that rather than order food deliveries from restaurant supply vendors, Claimant or his spouse Susie would purchase and deliver groceries for the restaurant.   ECV4 at 0345; 0352 (Claimant would purchase ice for the restaurant).   Taymen also indicated that Claimant helped maintain the email account including monitoring delivery orders on his phone and letting Taymen know they came in.   ECV4 at 0350.[8]   Taymen indicated Claimant helped with the Yelp page on occasion.   ECV4 Exh. 36 at 0351.   He also admitted that either Susie or Claimant would take care of food deliveries.   EXV4 Exh. 36 at 0352.

Taymen's lack of knowledge about the business demonstrates that Tayman had a much less active role than he testified to, or that Susie and Claimant had a much more active role than he testified to:

    (1)    he could not recall what type of business he incorporated, at 0344;

    (2)    he could not remember who he sold the business to on December 1, 2015, at 0344;

    (3)    he did not recall if he had a credit check prior to overtaking the lease, at 0345;

---

[7] Taymen could not explain why his mother was listed as the business manager on Noora's Yelp.com page. ECV4 Exh. 36 at 0352.

[8] In discovery Gindo indicated that he had been to Noora and had answered the phones. ECV2 Exh. 24 at 0160. He denied that he had be a representative, agent, or manager of Noora and denied that he had received wages from Noora. ECV2 Exh. 24 at 0160.

**AECOM NATIONAL SECURITY PROGRAMS, INC. AND CONTINENTAL INSURANCE COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

HOMAS QUINN, L.L.P.

81 Branch Street, Suite 330
an Francisco, CA 04100
el: (415) 646-6100
ax: (619) 376-1824

1    (4)    he did not recall if he purchased stoves, tables, chairs, at 0345; he did not

2            remember if the restaurant accepted checks, at 0345;

3    (5)    he did not recall the bank branch where he opened the corporate checking

4            account, at 0345;

5    (6)    he did not remember whether the business had a line of credit, at 0345;

6    (7)    he could not estimate or answer any questions concerning the frequency that

7            Claimant was at the restaurant, at 0345;

8    (8)    when provided photos of Noora, Taymen could not remember whether Claimant

9            had served as a waiter at any of the tables in the restaurant (which were identified

10            each in turn one by one), at 0348-0349;

11    (9)    he did not recall whether he corresponded with any food vendors through the

12            company email, at 0350;

13    (10)   he did not know whether Noora Café had any IRA accounts, closed investment

14            security custodian accounts; at 0353;

15    (11)   he did not know whether Noora Cafe ever transacted with cashier's, manager's,

16            or bank traveler's checks, at 0353;

17    (12)   he could recall whether he paid for the restaurant, at 0353;

18    (13)   he did not recall if he purchased dishware or silverware for the restaurant, at 0353;

19    (14)   he did not remember if he had any expenses associated with starting Noora Cafe,

20            at 0354;

21    (15)   he did not know whether Noora Cafe kept accounting books, but that he did not

22            keep them, at 0354;

23    (16)   he did not remember if anybody complained about any food deliveries George

24            made, at 0355;

25    (17)   he did not remember how much he paid in rent per month under his lease for

26            Noora Café although he paid it at least 24 times from October 2013 to December

27            2015, at 0356.

28

THOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94109
el (415) 546-6100
ax (619) 376-1624

1    Noora Cafe's social media suggests that Susie and Claimant had much more active roles

2 than Taymen testified to as well.  Noora Cafe's Yelp page makes reference to the "owners" in

3 the plural.  ECV2 Exh. 12 at 0095.  On March 2, 2015 Aaron S. posted that the delivery man

4 was very nice.  ECV2 Exh. 12 at 0097.  On December 7, 2014 Michael M. posted that Noora

5 had catered an event for him and that the "owners" were exceptionally friendly and welcoming.

6 ECV2 Exh. 12 at 0097.  After her visit, Reine H posted she, "was a fan of family-run places."

7 ECV2 Exh. 12 at 0098.  On January 23, 2015, Leslie P posted that when her father requested

8 root beer, "the owner sent someone to the liquor store on that block to buy some!"  ECV2 Exh.

9 12 at 0100.  On August 28, 2014, Dayton T. posted, "stopped by this great little family run

10 restaurant."  ECV2 Exh. 12 at 0100.  On August 24, 2014 AShoory posted, "you can tell the

11 family running it knew how to cook."  ECV2 Exh. 12 at 0101.  On November 11, 2014, Jessica

12 M posted, "say hello to the owners; they are very friendly and welcoming."  ECV2 Exh. 12 at

13 0101.  On March 6, 2015, Dawn T. posted, "don't forget to chat up the owners, they are very

14 warm and welcoming."  ECV2 Exh. 12 at 0107.  On December 29, 2013, Brian P. posted, "we

15 were greeted by the friendly staff which included the owners."  ECV2 Exh. 12 at 0107.  On

16 August 8, 2014, Pauli C. posted, "great family owned and operated small local business."  ECV2

17 Exh. 12 at 0107-0108.  On January 31, 2014, Ninweh K. posted, "the staff is nice and friendly

18 including the owner."  ECV2 Exh. 12 at 0110.  On January 31, 2014, posted, "the service is

19 excellent and the staff, along with the owner are great people that might spark up a small chat

20 with you while you wait for your meal."  ECV2 Exh. 12 at 0111.  The Yelp photos appearing in

21 ECV2 Exh. 12 at 0113-0114 display a middle-aged man behind the counter at the restaurant with

22 a mustache, but Taymen could not identify him at his deposition.

23    On April 13, 2014, Jessi B complained about a late delivery order by a male delivery

24 man, and Susie replied that they would deliver to Jessi B at no charge, **"So please contact me**

25 **Susie, or my husband George."**  ECV2 Exh. 12 at 0101-0103.  When questioned about this

26 incident, Taymen testified he did not recall any other males besides himself and Claimant that

27 delivered food for Noora Cafe.  EXHV 4 at 0352.

28    AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)
- 23 -

HOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94109
el: (415) 546-6100
ax: (510) 376-1024

1    Taymen provided a flimsy response when questioned about postings on his Groupon page

2    as well.  ECV4 Exh. 36 at 0351.  In as response to a comment from Michelle S. ("the owner and

3    chef were very friendly"), Taymen explained:

4         The owner would – she could have probably believed my father was the owner
          because of his presence there. He would basically just around on his computer,
5         like I said, checking the email, if anything.  She probably mistaken [sic] him for
          the owner.  He's a very friendly presence...
6

7    ECV4 Exh. 36 at 0351.[9]

8    Taymen also testified that his mother made the cheesecake at Noora Café.  ECV4 Exh.

9    36 at 0347.  When questioned about a comment from Chevell R on Groupon ("Nice chat with

10   the owner.  Hats off to his wife for her homemade cheesecake"), Taymen explained that she just

11   probably thought Claimant was the owner because she had a chat with them.  ECV4 at 0351.

12   Taymen and Claimant are also listed as the proprietors of Noora Café on the Assyrian

13   Chamber of Commerce in Chicago, IL.  ECV1 Exh. 11 at 0091.  Taymen said he listed Claimant

14   just to capitalize on his dad's famous name.  *Id.*

15   This evidence demonstrates Taymen was not the sole owner/operator and that Claimant

16   and Susie had substantial involvement in the day to day operations of Noora Cafe.  Taymen had

17   no knowledge of basic facts like how much the rent was, and had no idea if he had purchased

18   things like silverware and dishware for Noora Cafe – for example, presumably when opening a

19   restaurant the new owner and operator has some interest or care in picking out the silver and

20   dishes that the food will be presented on, or he might know how much he paid in rent every

21   month.  If he was even half the owner/operator he portrayed himself to be, he would have known

22   answers to the questions that were asked.  Of course, given that Taymen was attending college

23   and working part-time for Verizon during the time period in question, according to his LinkedIn

24   page, it is not surprising that he would not know these facts because he simply could not have

25   been there seven days a week for twelve hours a day as he testified.

26   ───────────────────
[9] At his interviews with Dr. Obolsky, Claimant said that he could not use a computer for any
27   more than 5 to 15 minutes because of his inability to concentrate.  ECV3 Exh. 34, Exh. 35.

28   **AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE**
     **COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

HOMAS QUINN, L.L.P.

51 Beach Street, Suite 330
an Francisco, CA 94109
el: (415) 546-6100
ax: (619) 376-1824

1    Furthermore, although he testified that Susie was only a helper, and that Claimant was a

2    backup helper to Susie, the customers clearly understood Claimant to be the owner. The fact that

3    Noora listed Susie as the Business Manager tends to support the notion that Claimant was the

4    operating face of the franchise.  The customer comments demonstrate that Claimant regularly

5    interacted with the customers.  Not only that, but after interactions between George and Susie

6    and customers, customers also referred to Claimant as the owner and Susie as the wife of the

7    owner – e.g. the owner's wife cheesecake.  This evidence demonstrates that the way customers

8    experienced Claimant at Noora Café and the way Taymen and Claimant portray Claimant's

9    involvement at Noora Café are starkly different.

10    **However, the Court need not rely on the customers' impression that Claimant was**

11    **working at Noora, because his spouse Susie, the Business Manager ("helper") responded**

12    **to Jessi B's negative delivery story on April 22, 2014, "So please contact me Susie, or my**

13    **husband George."**  ECV1 Exh. 12 at 0103.  Taymen did not make any comments on the Yelp

14    page.  Susie did not tell the customers to contact Taymen.  The customers talked about the

15    owners, *plural*.

16    Finally, in this context, Dr. Massel's report that his symptoms were triggered by **work**

17    **stress on March 3, 2014** takes on a new meaning - there can be little doubt about the **work**

18    **stress** being from Noora Café as Taymen testified it made no money and indeed that it was

19    closed in December 2015 for that reason.  As Claimant has denied that he was ever employed

20    after his employment with AECOM,[10] the only possible inference is that Claimant was referring

21    to working at Noora, even though he may have not earned wages in the traditional sense.

22    In any event, regardless of whether Claimant's involvement was limited to getting

23    groceries, delivering food, and relaying internet food orders, or whether Claimant, Susie, and

24    Tayment actually operated Noora Café as a "family restaurant," while Taymen was going to

25

THOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94109
el: (415) 648-0100
ax: (619) 378-1824

26    [10] Mr. Gindo has sworn up and down that he has not worked since returning from his

27    employment with AECOM on September 13, 2011, including on his LS-200, in his discovery
responses, at his deposition, and at his interviews with Dr. Obolsky, Dr. Rahim, and Dr. Conroe.

28    **AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE**
**COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**
- 25 -

1    school and working part-time, this is the only evidence on the record that reflects Mr. Gindo's

2    work activities and thus his reasonable earning capacity as of July 23, 2014.

3         On July 23, 2014, the State of Illinois had a minimum wage of $8.25.  ECV1 Exh. 3 at

4    0010.  If Claimant worked full-time 40-hour work weeks for 260 days in a year, his average

5    annual earnings would be $330.00.

6         The United States Bureau of Labor Statistics data from 2014, published in May of 2015,

7    for all Dining Room and Cafeteria Attendants and Bartender Helpers in the Metropolitan

8    Chicago area average lists an annual average income of $21,620.00, which would correspond to

9    an average weekly wage of $415.77.  ECV3 Exh. 31 at 0203.  Such employees are described as

10   facilitating food service, cleaning tables, removing dirty dishes, replacing soiled table linens,

11   setting tables; replenishing supplies, clean linens, silverware, glassware, and dishes; supplying

12   service with bar food; and serving some items such as water, condiments, and coffee to patrons.

13   *Id.* at 0200.  While not precise, these activities reasonably approximate Claimant's earning

14   capacity on July 23, 2014.

15        The United States Bureau of Labor Statistics data from 2014, published in May of 2015,

16   for all Waiters and Waitresses in the Metropolitan Chicago Area lists and annual average income

17   of $21,980.00, which would correspond to an average weekly wage of $422.69.  ECV3 Exh. 32

18   at 0222.  Such employees are described as taking orders for food and serving beverages.  *Id.* at

19   0215.  While Taymen and Claimant denied Claimant did these activities, Claimant was friendly

20   with customers and thus may reasonably approximate Claimant's earning capacity on July 23,

21   2014.

22        The United States Bureau of Labor Statistics data from 2014, published in May of 2015,

23   for Combined Food Preparation and Serving Workers, Including Fast Food in the Metropolitan

24   Chicago Area lists and annual average income of $20,000.00, which would correspond to an

25   average weekly wage of $384.62.  ECV3 Exh. 33 at 0237.  Such employees perform duties which

26   combine preparing and serving food and non-alcoholic beverages.  ECV3 Exh. 33 at 0230.

27

28        AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
              COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)
                                    - 26 -

THOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94109
el: (415) 546-6100
ax: (619) 376-1824

1   Although Taymen said he did all of the food prep, these types of activities reasonably

2   approximate Claimant's earning capacity on July 23, 2014.

3       Given that none of the options fits precisely Claimant's jack-of-all-trades roles at Noora

4   Café, it would be reasonable to average the four, and which would yield an average weekly wage

5   of $388.27 and a compensation rate of $258.85. Thus, if the Court finds that Mr. Gindo is not a

6   "retiree" under the Board's test, he should be entitled to temporary total disability benefits from

7   July 23, 2014 on going until he reaches MMI at a rate of either $0.00 based on the fact he had

8   no earnings for three years prior to July 23, 2014, or $258.85 per week based on the fact he had

9   the potential to have earned something at Noora Café.

10
11   **II.**    **IF THE COURT FINDS THAT CLAIMANT DOES NOT SUFFER FROM AN OCCUPATIONAL DISEASE, THEN CLAIMANT'S UNSCHEDULED ACCIDENTAL INJURY IS NOT COMPENSABLE.**

12       The 1984 Amendments did not expand coverage to employees suffering from

13   unscheduled accidental injuries who separated from employment for reasons unrelated to the

14   work-related unscheduled accidental injury – such employees have not suffered a "disability,"

15   within the meaning of the Act because the loss of earning capacity is not, "because of injury."

16   33 U.S.C. § 902(2), (10); *Moody*, BRB No. 15-0314; citing *Hoffman v. Newport News*

17   *Shipbuilding & Dry Dock Co.*, 35 BRBS 148 (2001); *Burson v. T. Smith & Son, Inc.*, 22 BRBS

18   124 (1989). If Claimant's PTSD is not an occupational disease, he has no loss of earning capacity

19   and he is not entitled to compensation benefits because his PTSD did not cause him to leave his

20   employment.

21       The well-established rule is that a claimant suffering from an unscheduled injury is a

22   voluntary retiree if the reason for leaving his employment with the employer was not due to his

23   work-place injury.  See *Moody*, BRB No. 15-0314 (Mar. 10, 2016) (holding claimant who

24   suffered a back injury and was provided modified duty and subsequently left employment quit

25   for reasons other than his back injury voluntarily retired); *Brooks v. Director, OWCP*, 2 F.3d 64,

26   66 (4th Cir. 1993) (holding that where employee performing modified duty who was discharged

27   for breaching company rule as opposed to disability not eligible for benefits); *Harmon v. Sea-*

28       AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)
- 27 -

'HOMAS QUINN, L.L.P.

61 Beach Street, Suite 330
an Francisco, CA 94109
ax (415) 646-6100
ax (819) 376-1824

1    *Land Service, Inc.*, 31 BRBS 45 (1997) (holding claimant who suffered a work-related traumatic

2    injury and became unable to perform his usual work prior to his longevity retirement remained

3    disabled following his retirement); *Hoffman v. Newport News Shipbuilding and Dry Dock*

4    *Company*, 35 BRBS 148, 2001 WL 1004171 (Aug. 22, 2001) (holding claimant voluntarily

5    retired when despite having a 28% right knee impairment and being on modified duty claimant

6    accepted an early retirement package).

7          The evidence here establishes that Claimant did not leave his employment because of his

8    PTSD or its symptoms and thus he is a voluntary retiree who has not suffered a disability within

9    the meaning of Section (2)(10).  See *infra*, at I.c.1.  Without the benefit of Section 10(i),

10   Claimant's time of injury is September 13, 2011; Claimant's disability on July 23, 2014 therefore

11   did not stop him from earning the wages in his employment on September 13, 2011, and his

12   disability is not a "disability," under Section 2(10).

13         While the result may seem harsh, it is claimant's burden to establish his loss of wage-

14   earning capacity and that is statutorily impossible in this case.  *Moody*, BRB NO. 15-0314; citing

15   *McBride v. Eastman Kodak Co.*, 844 F.2d 797, 21 BRBS 45 (CRT)(D.C. Cir. 1988).  Simply

16   put, "when a claimant leaves or is discharged from his usual work for reasons unrelated to his

17   work-related injury, he does not have a disability within the meaning of the Act and is not entitled

18   to total disability compensation." *Kogut v. Electric Boat Corp.*, BRB No. 14-0046, 2014 WL

19   5308941 at 2-3 (2014)(unpublished).  The authorities are unambiguous and when Congress

20   elected to carve out the exception for latent onset occupational disease, it declined to do so for

21   traumatic injuries.  If Claimant's PTSD is characterized as a traumatic injury, then the fact that

22   the disabling symptoms only became manifest three years after he left his employment is

23   determinative and he is only entitled to Section 7 medical benefits.

24   / / /

25   / / /

26   / / /

27   / / /

28

HOMAS QUINN, L.L.P.
81 Beach Street, Suite 330
an Francisco, CA 94109
el (415) 646-0100
ax: (619) 378-1824

**AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

**III.** **IF THE COURT FINDS THAT CLAIMANT DOES NOT SUFFER FROM AN OCCUPATIONAL DISEASE, THEN CLAIMANT FAILED TO TIMELY NOTICE HIS CLAIM AND HE IS BARRED FROM COMPENSATION BENEFITS.**

Section 12 prohibits a claimant from receiving compensation benefits when he has failed to notice the deputy commissioner and the employer.  33 U.S.C. 912(d). In pertinent part Section 12 provides:

**§ 912 Notice of injury or death**

(a)    Time limitation. Notice of an injury or death in respect of which compensation is payable under this Act shall be given within…thirty days after the employee or beneficiary is aware, or in the exercise of reasonable diligence or by reason of medical advice should have been aware, or a relationship between the injury or death and the employment.

…

(d)    Failure to give notice.  Failure to give such notice shall not bar any claim under this Act

(1)    if the employer (or his agent or agents or responsible official or officials designated by the employer pursuant to subsection(c) or the carrier had knowledge of the injury or death,

(2)    the deputy commissioner determines that the employer or carrier has not been prejudiced by failure to give such a notice, or;

(3)    if the deputy excuses such failure on the ground that

(i)    notice, while not given to a responsible official designated by the employer pursuant to subsection (c) of this section, was given to an official of the employer or the employer's insurance carrier, and that the employer or carrier was not prejudiced due to the failure to provide notice…

This section is to be interpreted liberally, but its plain terms may not be disregarded under the guise of interpreting it liberally. *Eikel v. Voris*, 101 F.Supp. 963 (S.D. Tex 1951) aff'd 200 F.2d 724, rev'd on other grounds, 346 U.S. 328.  The form and content of the notice must contain a statement concerning the nature and extent of the disability so the employer and carrier can commence a prompt investigation.  *Strachan Shipping Co. v. Davis*, 571 F.2d 968 (5th Cir. 1978); *Smith v. Aerojet-General Shipyards, Inc.*, 647 F.2d 518 (5th Cir. 1981); *Good*

'HOMAS QUINN, L.L.P.
81 Beach Street, Suite 330
an Francisco, CA 94109
el: (415) 848-6100
ax: (619) 376-1024

**AECOM NATIONAL SECURITY PROGRAMS, INC. AND CONTINENTAL INSURANCE COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

1    *Impression, Inc. v. Britton*, 169 F.supp. 866 (D.C. Cir. 1958).  Deprivation of the opportunity to

2    investigate the events surrounding the injury is prejudicial.  *Port of Portland v. Director, OWCP*,

3    932 F.2d 836 (9th Cir. 1991).

4          Claimant filled out a LS-203 on July 20, 2014.  CX1 at 1.  On his LS-203, in Box 33,

5    "Name of Employer," he wrote unemployed.  Under Box 34. "Nature of employer's business,"

6    he wrote "n/a."  And under Box 35, "Address of employer," he wrote "n/a."  On Page 2 it

7    indicates that that the reader should see attached Claim for Benefits.  *Id.*  The Claim for Benefits

8    is written to the OWCP and is captioned, "George N. Claimant v. AECOM, Employer, and AIG

9    Global Claims, Carrier." CX2 at 1.  Likewise, the Notice of Retainer for Mr. Barnett's office

10   identifies the employer as AECOM and the carrier as AIG.  JXV1 Exh. 1 at 0002.

11         This imprecise filing created a vortex of confusion that resulted in the proper carrier,

12   Continental Insurance Company, being joined on March 17, 2015, which the Court describes

13   accurately in its Order dated March 17, 2015.  The confusion that unfolded relates specifically

14   to the puzzling identification of AIG as carrier for AECOM.  After attorneys for Insurance

15   Company of the State of Pennsylvania ("ICSP") (AIG is not a carrier) found the only employer

16   it covered on Claimant's date of injury was an AECOM Technology Corp. subsidiary named AC

17   First, LLC, it filed a LS-18 on behalf of subsidiary AC First, LLC on October 28, 2014.  Order

18   dated March 17, 2015.  At some point, attorney for AECOM Technology Corp. and ICSP

19   ascertained that Claimant had worked for a defunct subsidiary McNeil Technologies, Inc. and

20   that ACE American Insurance Company was the carrier.  Order dated February 20, 2015.

21         The end affect was that AECOM National Security Programs, Inc., f.k.a McNeil

22   Technologies, Inc., was not noticed of a claim against it until the parent company AECOM

23   Technology Corp. was able to figure out that Claimant had worked for AECOM National

24   Security Programs, Inc. f.k.a. McNeil Technologies, Inc.  By that point, serious damage had been

25   done between McNeil Technologies, Inc. and Continental Insurance Company regarding the

26   cooperation and notice requirements of the policy such that Continental Insurance Company

27   denied coverage (under a contract theory outside the jurisdiction of the OALJ) and later led to

28

THOMAS QUINN, L.L.P.

61 Beach Street, Suite 330
an Francisco, CA 94109
el (415) 646-0100
ax (619) 376-1824

**AECOM NATIONAL SECURITY PROGRAMS, INC. AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

1   the ICSP's attorney remaining in the case as representatives of the parent, AECOM Technology

2   Corp., and perversely, the actual employer, AECOM National Security Programs, Inc. without

3   representation until Continental Insurance Company dropped its controversion and the Court

4   approved stipulations.   Order dated March 4, 2016.   The bizarre context actually led to

5   Continental Insurance Company have to propound discovery on AECOM Technology, Corp. as

6   a means to obtain documentary evidence and information as part of its investigation of the claim.

7   See Order dated September 22, 2015.

8          This bizarre and unusual situation began with Claimant's LS-203, which failed to comply

9   with the requirements of Section 12(c).   He wrote "unemployed," instead of identifying his

10  employer, and started the fire.   Claimant's counsel's vague identification of "AECOM," which

11  is not an actual corporation or person (rather than AECOM Technology, Corp, AC First, LLC,

12  AECOM National Security Programs, Inc., etc.), completely incorrect identification of AIG

13  Global Claims as the carrier (again, AIG is not a carrier, ICSP is) poured gasoline all over it.

14  This resulted in a number of severe prejudices.

15         First, Continental Insurance Company did not have access to the employer to perform

16  any kind of investigation prior to the Court entering the parties' coverage stipulations in March

17  of 2016, and in fact had to propound discovery on the employer's parent company to investigate

18  the claim.  Second, AECOM Technology Corp., the parent company, unnecessarily was involved

19  in this litigation for about nine months and during which time sustained the costs of keeping

20  ICSP's attorneys on after ICSP was released from the case.   Third, ICSP unnecessarily sustained

21  litigation costs because for some still unknown reason Claimant's counsel identified AIG Global

22  Claims on the Claim for Benefits.   Fourth, AECOM National Security Programs, Inc. and

23  Continental Insurance Company have been exposed to Claimant's counsel litigation costs

24  between July 23, 2014 and at least March of 2015, during which time Claimant, AECOM

25  Technology Corp., ICSP, and ACE American Insurance Company tried (unsuccessfully) to

26  figure out who Claimant worked for and who was the carrier.   Fifth, due to the fact that Claimant

27  never worked for the parent company, the actual employer, AECOM National Security

28

THOMAS QUINN, L.L.P.

61 Beach Street, Suite 330
an Francisco, CA 94109
el (415) 548-6100
ex (619) 376-1824

**AECOM NATIONAL SECURITY PROGRAMS, INC. AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

1   Programs, Inc. was never able itself to perform an investigation until counsel for Continental

2   Insurance Company identified AECOM National Security Programs, Inc. as the successor to

3   McNeil Technologies, Inc. and as Claimant's employer.

4       Had Claimant simply identified his proper employer and followed the requirements for

5   service of notice in Section 12(c) none of these issues would have occurred.  Notably, his

6   termination letter dated September 13, 2011, which he signed, is on AECOM National Security

7   Programs, Inc. letterhead, and states its business address.  As, AECOM Technology, Corp. had

8   a different business address than AECOM National Security Programs, Inc., the Form LS-203

9   satisfies all of the requirements of Section 12(c), but Claimant failed to accurately fill out the

10  form.  Rather than fix the LS-203, Claimant's counsel filed it as it was with the Claim for

11  Benefits.  Claimant did not amend after having learned that it identified the wrong party and the

12  wrong carrier.  Claimant's LS-203 is still incorrect and not in compliance with Section 12(c).

13      Thus, the Court should find that Claimant failed to notice his employer timely or

14  properly, that the employer and carrier both suffered prejudice in their ability to investigate the

15  claim, and that therefore Claimant is barred from compensation benefits.

16                          **CLOSING STATEMENT**

17      The LHWCA only compensates for injuries that cause employees to lose the ability to

18  earn the wages they were earning when the injury occurred.

19      The evidence in this case has shown Claimant did not lose his ability to work for AECOM

20  because of his psychiatric disability; he lost his ability to work for AECOM because the

21  government cancelled the A3S2 contract.  Thus, the Court must first determine whether he

22  suffers from and occupational disease or a traumatic injury.  If an occupational disease, the Court

23  must decide whether he is a voluntary retiree and entitled to compensation under Section

24  10(d)(2)(B), or whether he is an involuntary retiree and entitled to compensation under Section

25  10(d)(1) – i.e. whether he left his employment with AECOM because of psychiatric injury.  If a

26  ///

27  ///

28

THOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
an Francisco, CA 94109
el (415) 546-6100
ax (619) 376-1924

**AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)**

1  traumatic injury, then Claimant does not have a compensable disability and even if he did, such

2  compensation would be barred for failure to notice the claim.

3

4  DATED:        September 16, 2016          Respectfully submitted,

5                                            THOMAS QUINN, LLP

6

7                                            By:  _____

8                                                 Michael W. Thomas
                                                  Edwin B. Barnes
9                                                 Attorneys for Respondents
                                            AECOM NATIONAL SECURITY PROGRAMS
10                                          INC., F.K.A. MCNEIL TECHNOLOGIES, INC.
                                            and CONTINENTAL INSURANCE COMPANY
11

12

13

14

15

16

17

18

19

20

21

22

23

24

THOMAS QUINN, L.L.P.

81 Beach Street, Suite 330
San Francisco, CA 94109
Tel: (415) 546-6100         25
Fax: (615) 376-1924

26

27

28      AECOM NATIONAL SECURITY PROGRAMS, INC.  AND CONTINENTAL INSURANCE
            COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)

**PROOF OF SERVICE**

**GEORGE GINDO V. AECOM NATIONAL SECURITY PROGRAMS INC., F.K.A. MCNEIL TECHNOLOGIES, INC. AND CONTINENTAL INSURANCE COMPANY**

**OALJ No.: 2015-LDA-00046; OWCP No.: 08-302442**

I am a citizen of the United States, over 18 years of age and not a party to the within-entitled action. I am employed at and my business address is THOMAS QUINN, LLP, 110 W. C Street, Suite 1707, San Diego, CA 92101. On September 16, 2016, I served the following:

**AECOM NATIONAL SECURITY PROGRAMS, INC.'S AND CONTINENTAL INSURANCE COMPANY'S POST HEARING BRIEF (ON SUBMISSION)**

☒    **BY MAIL:** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below. I am readily familiar with the regular practice of collection and processing of correspondence for mailing. Under that practice correspondence would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

**Attorney for Claimant**
David Barnett, Esq.
Barnett, Lerner, Karsen & Frankel, PA
2860 Marina Mile Blvd., Suite 105
Fort Lauderdale, FL 33312

I declare under penalty of perjury that the foregoing is true and correct. Executed at San Diego, California on September 16, 2016.

*Leana Robertson*
Leana Robertson

THOMAS QUINN, L.L.P.
781 Beach Street, Suite 330
San Francisco, CA 94109
Tel: (415) 545-6100
Fax: (619) 376-1824

AECOM NATIONAL SECURITY PROGRAMS, INC. AND CONTINENTAL INSURANCE
COMPANY'S POST-HEARING BRIEF (ON SUBMISSION)